**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**Civil Action No. 3:13-cv-446**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BANK OF AMERICA** | ) | |
| **CORPORATION, BANK OF** | ) | **COMPLAINT** |
| **AMERICA, N.A., BANC OF** | ) | |
| **AMERICA MORTGAGE** | ) | **JURY TRIAL DEMANDED** |
| **SECURITIES, INC., and MERRILL** | ) | |
| **LYNCH, PIERCE, FENNER &** | ) | |
| **SMITH, INC. f/k/a BANC OF** | ) | |
| **AMERICA SECURITIES LLC** | ) | |
| | ) | |
| **Defendants**. | ) | |
| _____ | ) | |

NOW COMES the United States of America, Plaintiff herein, by and through the Attorney General of the United States, and his designee, Anne M. Tompkins, United States Attorney for the Western District of North Carolina, and for its complaint hereby alleges as follows:

**NATURE OF THE ACTION**

1. This is an action brought by the United States of America seeking civil penalties against Defendants Bank of America Corporation ("BOA-Corp"), Bank of America, National Association ("BOA-Bank"), Banc of America Mortgage Securities, Inc. ("BOA-Mortgage") and Banc of America Securities LLC ("BOA-Securities") now known as Merrill Lynch, Pierce, Fenner & Smith, Inc. (collectively, "Defendants") pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. §1833a.

2.     This action arises out of Defendants' fraud against purchasers of residential mortgage-backed securities ("RMBS") that Defendants structured, offered, and sold.  In short, Defendants knowingly and willfully misled investors about the quality and safety of their investments in certain RMBS by making materially false and misleading statements and by omitting to disclose, among other things, important facts about the mortgages collateralizing the RMBS and Defendants' failure to conduct adequate due diligence, in offering documents filed with the United States Securities and Exchange Commission ("SEC").  At their core, Defendants' misstatements and omissions misled investors concerning the quality of the mortgages collateralizing the BOAMS 2008-A securitization, how BOA-Bank originated those mortgages, and the likelihood that the borrowers behind those mortgages would make their scheduled payments in a timely fashion.

3.     In January and February 2008, five investors, including the financial institutions Federal Home Loan Bank of San Francisco ("FHLB-San Francisco") and Wachovia Bank, National Association and certain of its subsidiaries ("Wachovia"), purchased over $850 million in purportedly prime RMBS issued in connection with the BOAMS 2008-A securitization that BOA-Bank sponsored, BOA-Securities underwrote and sold, and for which BOA-Mortgage served as the depositor.[1]  The overwhelming majority of these Certificates carried a triple-A rating (the same as U.S. Treasury bonds at the time) at the time of issuance.

4.     To investors such as FHLB-San Francisco and Wachovia, Defendants' strong reputations coupled with the high credit ratings carried by the Certificates and the purportedly prime credit quality of the jumbo mortgages collateralizing the BOAMS 2008-A securitization signified a safe and conservative investment and justified the high prices each paid to BOA-

_____
[1] For purposes of this Complaint, the RMBS issued as part of the BOAMS 2008-A securitization are referred to as "Certificates."

2

Securities – in some instances more than the face (or "par") value of the Certificates. Neither FHLB-San Francisco nor Wachovia intended their investment in the Certificates to entail significant credit risk. Unlike countless others at the time, the investors in the Certificates were not attempting to chase additional return by investing in risky "subprime" or "Alt-A" RMBS, which were collateralized by mortgages given to borrowers with shaky credit but that offered higher rates of return.

5. BOA-Securities offered and sold the Certificates pursuant to a shelf registration statement, prospectus, free writing prospectuses, prospectus supplement, pooling and servicing agreement and underwriting agreement filed with the SEC (collectively, the "Offering Documents") by BOA-Mortgage that BOA-Securities and BOA-Bank prepared. The Offering Documents contained untrue statements of material fact and omitted to state other material facts required to be disclosed that misled investors. BOA-Securities also provided investors with various iterations of preliminary loan tapes, stratification tables, and similar communications (collectively, "Preliminary Marketing Materials") purporting to identify important statistical information concerning each of the mortgages in the BOAMS 2008-A collateral pool. The Preliminary Marketing Materials also contained material misstatements and, in some cases, omitted to state other material facts required to be disclosed that misled investors. The Defendants knew the Offering Documents and Preliminary Marketing Materials were materially misleading yet they intended that they affect investors' decisions about whether to purchase the Certificates and, if so, at what price.

6. BOA-Bank originated all of the mortgages serving as collateral for the BOAMS 2008-A securitization during the third and fourth quarters of 2007. Of those mortgages, BOA-

3

Bank originated more than 70% through third party mortgage brokers. These mortgages were known as "Wholesale mortgages," and they were riskier than similar mortgages originated directly by BOA-Bank. Indeed, prior to the closing of the BOAMS 2008-A securitization, BOA-Bank's internal reports revealed a significant decrease in the origination quality and performance of Wholesale mortgages. Yet, the Offering Documents failed to disclose important information about the proportion of Wholesale mortgages in the collateral pool and about the relative riskiness of those mortgages compared to similar mortgages BOA-Bank originated directly.

7.     Moreover, more than 22% of the mortgages serving as collateral for the BOAMS 2008-A securitization were provided to purportedly self-employed borrowers and, of those, nearly 70% were "stated income/stated assets" mortgages, meaning that BOA-Bank did not verify the income these borrowers claimed to earn or the assets they claimed to own. These mortgages share many of the same characteristics of the now infamous subprime "Liar Loans," although Defendants misleadingly referred to them as "PaperSaver" mortgages. As Defendants knew, mortgages given to self-employed borrowers were more risky than mortgages given to salaried borrowers and stated income/stated assets mortgages given to self-employed borrowers were even riskier. Yet, the Offering Documents failed to disclose important information about the proportion of mortgages in the collateral pool that BOA-Bank provided to self-employed borrowers, including self-employed borrowers for whom BOA-Bank did not verify income or assets, and the relative riskiness of those mortgages compared to similar mortgages provided to salaried borrowers.

8.     Despite this knowledge and despite other information indicating that BOA-Bank's overall origination quality was deteriorating sharply, Defendants decided **not** to conduct any

Loan Level Due Diligence on the mortgages collateralizing the BOAMS 2008-A securitization in part to save roughly $15,000 in expenses (less than 0.0018% of the proceeds from the sale of the Certificates). Defendants made this decision, which violated BOA-Securities' policies, procedures, and prior practice and was contrary to industry standards and investor expectations, over the objection of the head of BOA-Securities' Due Diligence Group. In addition, this decision allowed Defendants to keep mortgages in the BOAMS 2008-A collateral pool that did not comply with the representations in the Offering Documents. Moreover, it eliminated any meaningful check on the accuracy of statistical information concerning the loans contained in the Offering Documents and Preliminary Marketing Materials.

9.     As a result of the decision not to conduct any due diligence, BOA-Bank, BOA-Securities, and BOA-Mortgage knowingly and willfully provided investors with materially false information in the Offering Documents and Preliminary Marketing Materials about the characteristics of the mortgages in the BOAMS 2008-A collateral pool. Moreover, this decision resulted in BOA-Bank, BOA-Securities, and BOA-Mortgage representing in the Offering Documents that BOA-Bank adhered to its underwriting standards when originating the mortgages in the BOAMS 2008-A collateral pool without sufficient basis for making such representations.

10.     Indeed, BOA-Bank, BOA-Securities, and BOA-Mortgage made those representations knowing that they were false and misleading. Evidence obtained by the United States has revealed that a material number of the mortgages in the BOAMS 2008-A collateral pool did not materially comply with BOA-Bank's underwriting standards. Although investigation continues, upon information and belief, more than 40% of the 1,191 mortgages in

5

the collateral pool did not substantially comply with BOA-Bank's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors. This is not surprising given the admissions from BOA-Bank employees involved in the origination of mortgages in the BOAMS 2008-A collateral pool that BOA-Bank emphasized quantity over quality when originating mortgages and that they were instructed by supervisors that it was not their job to discover fraud in mortgage applications.

11. For these, and other reasons that Defendants failed to disclose to investors, the Certificates were significantly riskier than represented in the Offering Documents and than suggested by their high credit ratings. The Certificates also were significantly riskier than similar previous RMBS that were sponsored by BOA-Bank, underwritten by BOA-Securities, and for which BOA-Mortgage served as the depositor. Yet the Offering Documents referred investors to performance information for those RMBS as a useful comparison for analyzing the Certificates, which further misled them.

12. The number of defaulted and delinquent mortgages in the BOAMS 2008-A collateral pool is abnormally high for a pool of prime borrowers of the quality represented by Defendants, and cannot be explained solely by the downturn in the real estate market over the last few years. As of June 2013, at least 23% of the mortgages in the BOAMs 2008-A collateral pool had defaulted or were otherwise delinquent. Specifically, 184 (15.4%) of the supposedly "prime" mortgages in the collateral pool had defaulted – causing nearly $70 million in principal losses – and a significant number of additional mortgages (at least 90 or 7.6%) were delinquent, in bankruptcy, and/or going through foreclosure and almost certainly going to cause additional principal losses. Fitch Ratings projects that the Certificates will suffer at least $50 million in

6

additional principal losses during their lifetime. As a result, the Certificates have performed significantly worse than expected. Indeed, one credit rating agency initially projected collateral losses of only 0.40% to 0.50% for the **entire** BOAMS 2008-A collateral pool, meaning that it projected principal losses of no more than $4.3 million for the entire pool. As a result, the Certificates have suffered credit downgrades causing additional losses to investors.

13. BOA-Corp. exercised direction and control over BOA-Bank, BOA-Securities, and BOA-Mortgage through its direct involvement and control over the business operations of BOA-Bank, BOA-Securities, and BOA-Mortgage.

14. FIRREA permits the Attorney General to commence civil actions to recover penalties from, among others, persons who violate specified provisions of Title 18 of the United States Code, including 18 U.S.C. § 1001 (false statement to government) and 18 U.S.C. § 1014 (false statement to financial institution). In such actions, the civil penalties assessed may equal $1.1 million per violation, or, for a continuing violation, up to $1.1 million per day or $5.5 million, whichever is less. 12 U.S.C. § 1833(a)(b)(1)-(2); *see also* 28 C.F.R. § 85.3. The statute further provides that the penalty can exceed these limits to permit the recovery of the amount of pecuniary gain received from or the amount of pecuniary loss caused by the violations. 12 U.S.C. §1833a(b)(3).

15. Defendants violated 18 U.S.C. §§ 1001 and 1014 by making false statements to and omitting material information from, federally insured financial institutions and others, in documents filed with the SEC and elsewhere. In furtherance of their fraudulent conduct, Defendants participated, shared, and/or received money and profits from federally insured financial institutions and others.

## JURISDICTION AND VENUE

16.     Jurisdiction is predicated upon 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as a plaintiff), and 12 U.S.C. § 1833a (civil penalty action).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1395(a) because all Defendants reside in this district and a substantial part of the events and omissions giving rise to the claims of the United States occurred in this district.  Further, all defendants are subject to personal jurisdiction in this district.

## PARTIES AND RELEVANT NON-PARTIES

18.     The Plaintiff is the United States of America, which brings this action pursuant to FIRREA, 12 U.S.C. §1833a.

19.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  It is the sole parent corporation of Defendants BOA-Bank and BOA-Securities.  As the sole corporate parent of BOA-Bank and BOA-Securities, BOA-Corp. exercised direction and control over their activities related to the issuance and sale of the Certificates.  Moreover, BOA-Corp. profited from the conduct of BOA-Bank and BOA-Securities alleged in this Complaint.

20.     Defendant Banc of America Securities LLC was a limited liability company organized under the laws of Delaware and headquartered in New York, New York.  At all times relevant to this Complaint, it was a wholly-owned subsidiary of BOA-Corp with offices in Charlotte, North Carolina.  In or around November 2010, BOA-Securities merged with Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a wholly-owned subsidiary of BOA-Corp.  Merrill Lynch, as successor-in-interest by merger, is liable for the conduct of BOA-

8

Securities alleged herein.  BOA-Securities served as the underwriter for the BOAMS 2008-A securitization and offered and sold the Certificates to FHLB-San Francisco, Wachovia, and other investors.

21.    Defendant Bank of America, National Association is a corporation organized under the laws of Delaware headquartered in Charlotte, North Carolina.  At all times relevant to the allegations herein, BOA-Bank was a federally insured financial institution and a wholly-owned subsidiary of BOA-Corp.  BOA-Bank originated all of the mortgages serving as collateral for the BOAMS 2008-A securitization and served as the sponsor of the BOAMS 2008-A securitization.  BOA-Bank also was the corporate parent of BOA-Mortgage.

22.    Defendant Banc of America Mortgage Securities, Inc. is a corporation organized under the laws of Delaware with principal offices located in Charlotte, North Carolina.  At all times relevant to the allegations in this Complaint, BOA-Mortgage was a wholly-owned subsidiary of BOA-Bank, and it did not have any officers or employees that were not also officers or employees of BOA-Corp, BOA-Bank, and/or BOA-Securities.  Thus, BOA-Corp., BOA-Bank, and BOA-Securities controlled all activities of BOA-Mortgage.  BOA-Mortgage did not have any significant business operations other than its role in BOA-Bank-sponsored RMBS.  BOA-Mortgage filed the shelf registration from which BOAMS securitizations were issued with the SEC on or about March 7, 2006.[2]

23.    The "BOA-Securities Managing Director" was a Managing Director at BOA-Securities and a Senior Vice President of BOA-Bank who, at all times relevant to the allegations of this Complaint, was in charge of the Mortgage Finance Group at BOA-Securities – the group that had responsibility for underwriting the BOAMS 2008-A securitization – and the Investor

---

[2] BOA-Mortgage filed an amended shelf registration with the SEC on or about May 12, 2006.

Relations Group at BOA-Bank – the group that had responsibility for selecting the mortgages to be securitized and determining the price at which BOA-Bank would sell those mortgages. The BOA-Securities Managing Director ultimately had responsibility for structuring the BOAMS 2008-A securitization and preparing the Offering Documents. At all times relevant to the allegations in this Complaint, the BOA-Securities Managing Director also served as President and Chief Executive Officer of BOA-Mortgage. The BOA-Securities Managing Director's annual bonus was largely dependent on Defendants continuing to profitably securitize mortgages originated by BOA-Bank. Thus, he had a strong financial motive to withhold negative information concerning the value of the Certificates from investors.

24. The "BOA-Bank Senior VP" was a Senior Vice President at BOA-Bank who, at all times relevant to the allegations herein, had responsibility for reviewing the Offering Documents for BOA-Bank and managing the settlement of securitizations. The BOA-Bank Senior VP was in the reporting chain of the BOA-Securities Managing Director. At all times relevant to the allegations in this Complaint, the BOA-Bank Senior VP also served as a Principal of BOA-Mortgage. In connection with the closing of the BOAMS 2008-A securitization on or about January 28, 2008, the BOA-Bank Senior VP executed certifications falsely attesting that, among other things, the mortgages in the BOAMS 2008-A collateral pool did "conform in all material respects to the description of the Mortgage Loans" in the Offering Documents and that Offering Documents did not "contain[] any untrue statement of a material fact or omit[] to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading" (the "Officer Certifications"). Also in connection with the closing of the BOAMS 2008-A securitization on or about January 28, 2008, the BOA-

10

Bank Senior VP executed on behalf of BOA-Mortgage other agreements that were provided to investors in the Certificates and to the ratings agencies, including the Pooling & Servicing Agreement ("PSA"), Mortgage Loan Purchase Agreement ("MLPA"), and the Underwriting Agreement. As described below, the PSA also contained false representations concerning the mortgages in the BOAMS 2008-A collateral pool. Upon information and belief, the BOA-Bank Senior VP's annual bonus and continued employment were dependent on Defendants continuing to profitably securitize mortgages originated by BOA-Bank. Thus, she had a strong financial motive to withhold negative information concerning the value of the Certificates from investors.

25. At all times relevant to the allegations in this Complaint, the Federal Home Loan Bank of San Francisco was a federally chartered bank created by the Federal Home Loan Bank Act 12 U.S.C. §§ 1421, *et seq*. and was a government-sponsored enterprise with its headquarters in San Francisco, California that was supervised and regulated by the Federal Finance Housing Board – an independent agency of the Executive Branch of the United States. FHLB-San Francisco was created to promote housing finance opportunities for Americans of all income levels. FHLB-San Francisco has a cooperative ownership structure. At all times relevant to the conduct alleged herein, FHLB-San Francisco had several hundred owners (referred to as "Members"), including numerous federally insured financial institutions such as banks and credit unions with a principal place of business in Arizona, California, or Nevada. For example, the following federally insured banks were Members of FHLB-San Francisco in 2007 and 2008: First Federal Bank of California, Pacific Western Bank, Nevada Security Bank, and Meridian Bank.

11

26.     Wachovia Bank, National Association was a national bank insured by the Federal Deposit Insurance Corporation at all times relevant to the allegations of this Complaint. Wachovia purchased RMBS, including the BOAMS 2008-A Certificates, directly and/or through its wholly-owned subsidiaries, including FFBIC, Inc. ("FFBIC").

## FACTS

### I.     <u>Background</u>

27.     RMBS are a type of asset-backed securities.  RMBS certificates purchased by investors are collateralized by a pool of residential mortgages.  Investors in RMBS are entitled to the payments that borrowers make each month on the mortgages in the pool backing the RMBS. If any borrower fails to make his or her required monthly payment for a mortgage in the pool, the value of the RMBS certificates is harmed.

28.     During the period relevant to the allegations herein, RMBS certificates were typically organized into prioritized tiers, called "tranches." The lowest "subordinated" tranches bore the highest risk but carried the greatest rates of return, while higher "senior" tranches provided the inverse.  The level of risk each tranche bore was supposed to be reflected in the credit ratings assigned by one or more credit rating agencies.  If the performance of an RMBS's collateral pool deteriorated, the lowest tranche would suffer losses prior to the more senior tranches.  Typically, the price investors paid for certificates was directly related to their credit risk, i.e. the more senior the tranche, the higher the value.

29.     As described in more detail below, the process of turning a pool of mortgages into RMBS involved a series of transactions among different, but often related, companies that tended to have no operations other than the creation of RMBS.

30. Because residential mortgages were the assets collateralizing RMBS, the origination of the mortgages started the process that lead to the creation of RMBS.

31. Originators like BOA-Bank decided whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applied its own underwriting standards to determine whether a particular borrower was qualified to receive a mortgage for a particular property. The underwriting standards consisted of a variety of metrics, such as the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the amount of the mortgage and any other liens compared to the value of the property at issue. According to the BOAMS 2008-A prospectus, BOA-Bank's underwriting standards were "intended to evaluate the applicants' repayment ability, credit standing, and the adequacy of the mortgage property as collateral for the mortgage loan" and were "designed to comply with applicable federal, state and local laws and regulations."

32. Historically, originators like BOA-Bank provided mortgages to borrowers and held the mortgages on their own books for the duration of the mortgage. Originators profited as they collected monthly principal and interest payments directly from the borrower. Originators also retained the risk that the borrower would default on the mortgage. Thus, originators had strong economic incentives to verify the borrowers' willingness and ability to repay their mortgages through strict compliance with prudent underwriting standards.

33. Beginning in or around the 1970s, originators like BOA-Bank began offloading the risk that mortgage borrowers would default to third parties by securitizing the mortgages and selling the resulting securities to investors. The securitization process shifted the originators'

13

focus from ensuring the ability of borrowers to repay their mortgages to ensuring that the originators could process (and obtain fees from) an ever-larger volume of mortgages for distribution as RMBS.  This practice was commonly referred to as the "originate-to-distribute" model.  The originate-to-distribute model drastically changed the economic incentives of originators like BOA-Bank and encouraged originators to focus on the quantity of mortgages originated rather than the quality of those mortgages.  It also allowed originators to receive revenues up front, rather than receiving them slowly over the life of each mortgage.

34.     BOA-Bank relied on the originate-to-distribute model to originate over $144 billion and $162 billion worth of residential mortgages and home equity loans in 2006 and 2007, respectively.   In December 2007, BOA-Corp. announced that BOA-Bank was "recognized as the top retail mortgage originator in the United States for the first nine months of 2007", and in January 2008, BOA-Corp. touted BOA-Bank "as the nation's premier lender to consumers."

35.     The BOAMS 2008-A securitization began with BOA-Bank, with some assistance from BOA-Securities, selecting from BOA-Bank's inventory approximately 1,191 mortgages with a total principal balance of more than $855 million.  BOA-Bank originated these "jumbo" mortgages during mid-July to late November 2007.  A jumbo mortgage is a mortgage in an amount above the conventional "conforming" limit set by Fannie Mae and Freddie Mac, which, in 2007, was approximately $417,000 for a single-unit dwelling.  The original principal balances of the mortgages serving as collateral for the BOAMS 2008-A securitization ranged from $420,000 to $1.6 million.

36.     Defendants marketed the BOAMS 2008-A securitization as a "prime" securitization, meaning that the mortgages backing it were supposed to be of higher credit

quality than subprime or Alt-A mortgages. Unlike prime mortgages, subprime or Alt-A mortgages were typically given to borrowers with low credit scores and poor credit history, who generally had little to no equity in the property, and/or who often did not use the property as a primary residence. On the other hand, Defendants claimed that the BOAMS 2008-A securitization was backed by mortgages given to borrowers with an average FICO score of 750, which at the time was considered to be an "excellent" score, and that over 94% of those borrowers used the property as a primary residence. Because the BOAMS 2008-A securitization was marketed as a prime (i.e. safer and more conservative) securitization, it offered a lower return to investors than subprime or Alt-A RMBS.

37.     BOA-Bank originated residential mortgages for the BOAMS 2008-A securitization either directly to consumers (through its website, retail branches, and telephone systems) (the "Direct Channel") or indirectly through mortgage brokers (the "Wholesale Channel"). These mortgage brokers were not employees of BOA-Bank and had a strong financial incentive to have BOA-Bank approve mortgage applications they submitted. Of the 1,191 mortgages collateralizing the BOAMS 2008-A securitization, 837 (or 70.3%) were originated through the Wholesale Channel.

38.     After originating the mortgages, BOA-Bank "sold" them to its wholly-owned subsidiary BOA-Mortgage pursuant to the MLPA dated January 28, 2008, which was executed by the BOA-Bank Senior VP (on behalf of BOA-Mortgage) and her supervisor (on behalf of BOA-Bank). The MLPA was attached to a Form 8-K filed with the SEC by BOA-Mortgage on or about February 2, 2008, and it was provided to the ratings agencies as part of their providing initial ratings for the Certificates.

15

39.     BOA-Mortgage subsequently transferred the mortgages into the Banc of America Mortgage 2008-A Trust, which was commonly referred to as the "issuing entity." The issuing entity was formed pursuant to the PSA dated January 28, 2008, among BOA-Bank, BOA-Mortgage, and others. The BOA-Bank Senior VP executed the PSA on behalf of BOA-Mortgage and her supervisor executed it on behalf of BOA-Bank. The PSA was attached to a Form 8-K filed with the SEC by BOA-Mortgage on or about February 2, 2008, and it was provided to the ratings agencies as part of their providing initial ratings for the Certificates.

40.     The PSA contained numerous materially false representations regarding the mortgages in the BOAMS 2008-A collateral pool, including that for each such mortgage:

a.  "Any and all requirement of any federal, state or local law … applicable to the origination and servicing of Mortgage Loan have been complied with."

b.  "There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration."

c.  "Each appraisal of the related Mortgaged Property is in a form acceptable to Fannie Mae or Freddie Mac and such appraisal complies with the requirements of FIRREA, and was made and signed, prior to the approval of the Mortgage Loan application, by a Qualified Appraiser[3]."

d.  "The Mortgage Loan was underwritten in accordance with the applicable Underwriting Guidelines in effect at the time of origination with exceptions thereto exercised in a reasonable manner."

41.     The issuing entity then transferred the Certificates, which represent an ownership interest in the cash flow from the mortgages collateralizing the BOAMS 2008-A securitization

---

[3] The PSA defined "Qualified Appraiser" as "An appraiser … who had no interest, direct or indirect, in such Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the related Mortgage Loan and who met the minimum qualifications of Fannie Mae or Freddie Mac."

16

(i.e., the principal and interest generated as borrowers make monthly payments on the mortgages in the pool), to BOA-Mortgage.

42.     BOA-Mortgage then "sold" the Certificates to BOA-Securities pursuant to the Underwriting Agreement dated January 25, 2008, which was executed by the BOA-Bank Senior VP (on behalf of BOA-Mortgage), her supervisor (on behalf of BOA-Bank), and one of the BOA-Securities Managing Director's direct reports (on behalf of BOA-Securities).  The Underwriting Agreement was attached to a Form 8-K filed with the SEC by BOA-Mortgage on or about February 2, 2008, and it was provided to the ratings agencies as part of their providing initial ratings for the Certificates.  The negotiations over the terms of the sale occurred between officers and employees of BOA-Bank and BOA-Securities.

43.     Various of the Defendants paid each other for the Certificates before offering and selling them to investors. According to the prospectus supplement, BOA-Securities paid BOA-Mortgage more than $835 million for the Certificates.  BOA-Securities attempted to "purchase" the Certificates from BOA-Mortgage at a price lower than BOA-Securities would obtain from third party investors for the Certificates (nearly $850 million).  BOA-Securities profited from this difference, which amounted to nearly $15 million for the BOAMS 2008-A Certificates.  BOA-Securities could also profit by retaining certain Certificates for its own investment.  BOA-Bank profited from the difference between its cost to originate the mortgages and the price paid by BOA-Securities for the mortgages.  BOA-Bank also profited from its ongoing role as servicer for the mortgages, i.e. collecting homeowners' mortgage payments and remitting them to the trustee for the BOAMS 2008-A securitization to be paid to investors.

17

44.     After obtaining the Certificates, BOA-Securities offered and sold them to third party investors.  In doing so, BOA Securities used: (i) the Offering Documents (including the registration statement, prospectus, prospectus supplement, free writing prospectuses, PSA and Underwriting Agreement) and (ii) Preliminary Marketing Materials.  Officers and employees of BOA-Bank and/or BOA-Securities that reported to the BOA-Securities Managing Director prepared these materials.  Officers and employees of BOA-Bank and/or BOA-Securities also filed the Offering Documents with the SEC on behalf of BOA-Mortgage.  The prospectus and prospectus supplement, which were dated January 25, 2008, were electronically filed with the SEC on or about January 29, 2008, and they prominently bore the BOA-Corp. corporate logo on the first page.  In addition, senior BOA-Bank employees, such as the BOA-Bank Senior VP and the BOA-Bank Senior VP's supervisor, signed Officer Certifications in connection with the BOAMS 2008-A securitization.  These certifications, which were required to close the securitization, falsely represented that the Offering Documents did not contain any material misstatements or omit to disclose any required material information.

45.     The federal securities laws and regulations required that the Offering Documents include an accurate description of the mortgages serving as collateral for the Certificates, including the underwriting criteria used to originate the mortgages in the collateral pool, any changes to those criteria, and the extent to which the underwriting criteria could be overridden. *See, e.g.,* Item 1110 of Regulation AB, 17 C.F.R. § 229.1110 (2007); Item 1111 of Regulation AB, 17 C.F.R. § 229.1111 (2007).  The Offering Documents also were required to disclose significant risk factors affecting the Certificates. *See* Item 1103 of Regulation AB, 17 C.F.R. § 229.1103 (2007).  The federal securities laws and regulations also required the Offering

18

Documents to disclose all material information necessary to make the other representations contained in the Offering Documents not misleading. *See, e.g.,* Section 503 of Regulations S-K, 17 C.F.R. § 229.503; Item 1103 of Regulation AB, 17 C.F.R. § 229.1103 (2007); Rule 408 under Securities Act of 1933, 17 C.F.R. § 230.408 (2005).  In other words, Defendants were required to make full and accurate disclosure in the Offering Documents of all information a potential investor might find material, including all significant risk factors affecting the performance of the Certificates.  Because the federal securities laws and regulations required such disclosure, reasonable investors would have expected such information to be included in the Offering Documents.

46.     By securitizing the 1,191 mortgages in the BOAMS 2008-A collateral pool, BOA-Bank essentially shifted most of the risk of default on the mortgages to third party investors.  In order to accurately assess the risks they were assuming by purchasing the Certificates, it was critical for investors to be truthfully advised of the characteristics of the mortgages backing the Certificates and all significant risk factors affecting the Certificates as well as the underwriting standards BOA-Bank used to originate those mortgages and its compliance with those underwriting standards.

## II.     The Certificates' Triple-A Credit Ratings

47.     At the time of their issuance, all of the nearly $600 million (par value) of Certificates purchased by FHLB-San Francisco and all but one of the approximately $235 million (par value) of Certificates purchased by Wachovia[4] carried triple-A credit ratings from Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's, and Fitch Ratings.  The coveted triple-A rating purportedly signified that the Certificates were extremely safe and

---

[4] Wachovia purchased one tranche of Certificates that carried a AA rating.

represented a conservative investment. For example, according to Moody's, it awarded its highest rating ("Aaa") only to those RMBS certificates that "are judged to be of the highest quality, subject to the lowest level of credit risk." *See* Moody's Rating Symbols & Definitions at 5 (available at: www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004 (accessed on 12/6/12).

48.     In fact, the Certificates could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because, among other reasons, the primary purchasers of the Certificates were institutional investors, such as FHLB-San Francisco, which were generally limited to buying only securities with the highest credit ratings because of their conservative investment philosophies. Specifically, FHLB-San Francisco's investment policies and procedures in place in December 2007 only permitted it to invest in RMBS certificates that carried a triple-A rating. Wachovia had similar, although slightly more expansive, investment guidelines in place in December 2007.

49.     The price paid by FHLB-San Francisco and Wachovia for their Certificates reflected the Certificates' high credit ratings and the reputations of BOA-Bank, BOA-Securities, and BOA-Mortgage within the RMBS marketplace. For instance, FHLB-San Francisco paid **more than** face value for their Certificates – nearly $606 million in return for only $599 million par value of Certificates. Wachovia also paid a high price for its AAA Certificates, over $221 million for approximately $224 million par value of Certificates. These prices were significantly higher than those paid by the other investors in the BOAMS 2008-A securitization, who purchased lower-rated Certificates at a discount. For instance, the registered investment advisor Shay Assets Management, Inc. ("Shay") paid approximately $5 million for nearly $6 million par

value in AA and BBB rated Certificates, and the investment advisor Summit Investment Advisors, Inc. ("Summit") paid nearly $4 million for slightly more than $5 million par value in A rated Certificates.

50.     In providing the initial ratings for the Certificates, Moody's, Standard & Poor's, and Fitch Ratings all used information provided by BOA-Securities and BOA-Bank, including the Offering Documents and Preliminary Marketing Materials.  Indeed, the prospectus supplement represented that the rating agencies "take into consideration the credit quality of the Mortgage Pool" collateralizing the securitization.  The information that the rating agencies had concerning the credit quality of the BOAMS 2008-A collateral pool came directly from Defendants.  The rating agencies did not have access to the underlying mortgage files.  False statements and statistics provided to the credit rating agencies concerning the credit quality of the mortgages in the BOAMS 2008-A collateral pool, rendered the ratings on the Certificates unreliable.

**III.     Defendants' Material Misrepresentations and Omissions**

51.     The performance and value of the Certificates has and continues to be almost entirely dependent on whether borrowers repay their mortgages in a timely manner and, if not, whether the collateral securing the mortgages is of adequate value to cover the amounts outstanding.  Because investors did not have access to the original loan files for the mortgages collateralizing the BOAMS 2008-A securitization, they had to rely solely on Defendants for information concerning the likelihood of borrowers repaying their mortgages in a timely manner and the value of the collateral supporting the mortgages.  Thus, the Offering Documents' representations about the quality of the mortgages and how BOA-Bank originated them

21

discussed below were of critical importance to investors. Defendants made factual representations designed to convince investors that the Certificates were backed by mortgages given to borrowers who were likely to make their required payments on time and that were supported by adequate collateral. However, as described below, several key representations were false, and Defendants also failed to disclose other material information bearing upon the quality of the mortgages collateralizing the BOAMS 2008-A securitization.

52. BOA-Bank, BOA-Mortgage, and BOA-Securities knowingly and willfully made these material false statements and omitted to disclose other important information with the purpose and intent of inducing the investors, including FHLB-San Francisco and Wachovia, to purchase the Certificates.

   **a. Defendants' False Statements and Omissions Concerning Conformance With BOA-Bank's Underwriting Standards**

53. Of the 1,191 mortgages collateralizing the BOAMS 2008-A securitization, BOA-Bank originated 837 of them through its Wholesale Channel during the period July through November 2007: July (4), August (136), September (109), October (394), and November (194). BOA-Bank originated the remaining 354 mortgages through its Direct Channel during the period July through November 2007: July (11), August (121), September (95), October (92), and November (35).

54. The prospectus for the BOAMS 2008-A securitization promised investors that BOA-Bank designed its underwriting standards to ensure that borrowers have the ability to meet their monthly mortgage payments. For example, it represented that "**Each Mortgage** loan" in the trust "will have been underwritten … to the standards set forth in this prospectus…." (Emphasis added) It further represented that "**each mortgage** …is underwritten in accordance

22

with guidelines established in Bank of America's Product and Policy Guides." (Emphasis added) The prospectus also represented that, "In assessing an applicant, Bank of America requires supporting documentation (or other verification) for all material data provided by the applicant, unless the applicant qualifies for" a reduced documentation mortgage.  Similarly, in the PSA, BOA-Mortgage represented that for each of the mortgages in the BOAMS 2008-A collateral pool: (i) all laws applicable to the origination and servicing of the mortgage had been complied with; (ii) there was no default, breach, violation or event of acceleration; (iii) an appraisal in a form acceptable to Fannie Mae or Freddie Mac and in compliance with the requirements of FIRREA had been completed and signed by a "Qualified Appraiser; " and (iv) BOA-Bank's underwriting standards in effect at the time of origination had been complied with and that exceptions to the standards had been "exercised in a reasonable manner."

55.     The applicable BOA-Bank underwriting standards in place during the origination of the mortgages in the BOAMS 2008-A collateral pool did not permit BOA-Bank to provide a mortgage to a borrower engaging in fraud or otherwise misrepresenting his or her income, assets, intent to occupy, employment status, credit history, or identity.  Moreover, pursuant to the relevant documents governing the mortgages, borrower misrepresentations or other frauds would constitute a "breach" and/or "violation" as those terms were used in the PSA.

56.     Had mortgages in the collateral pool not been originated in accordance with BOA-Bank's underwriting standards, it was common practice in the RMBS market (and would have been reasonably expected by potential investors in the Certificates) that such information would be specifically disclosed in the Offering Documents.  For example, the prospectus supplement for the CWABS 2007-13 RMBS that Countrywide sponsored in November 2007

contained a specific risk factor that warned, "a significant number of the mortgage loans will have been originated based on underwriting exceptions" and that as a result, "the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner." None of the Offering Documents or Preliminary Marketing Materials for the BOAMS 2008-A securitization included such a warning. If they had, the Certificates' credit ratings would have been negatively affected.

57.     The BOAMS 2008-A prospectus further represented that deviations from BOA-Bank's underwriting standards would have to be offset by "documented compensating factors" identified by the BOA-Bank employee or system responsible for approving the mortgage. In other words, the prospectus explained, a mortgage "is considered to be underwritten in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in **substantial compliance** with such underwriting guidelines." (Emphasis added)

58.     Whether BOA-Bank underwrote the mortgages in the BOAMS 2008-A collateral pool in conformance with its underwriting standards constituted material information for investors because it directly related to the quality of the mortgages and the likelihood that they would be paid in a timely fashion and, if not, whether the collateral was of sufficient value to cover any shortfall. Thus, such information directly related to the safety and value of the Certificates backed by the mortgages because each mortgage default negatively impacts the flow of payments to the investors in the Certificates. A collateral pool consisting of improperly originated mortgages has a much different risk profile than a pool of properly originated mortgages. In fact, a trader at BOA-Securities responsible for trading certain of the Certificates

24

and other similar RMBS ("BOA-Securities Trader") admitted that he "didn't feel comfortable" including mortgages with exceptions to BOA-Bank's underwriting standards in the BOAMS 2008-A collateral pool because they were more risky than mortgages that complied with the underwriting standards. His discomfort was supported by research published by Fitch Ratings on or about November 28, 2007, which found that, "Losses are more likely to be low if the originator consistently applies underwriting policies and guidelines…."

59. Prior to sending the BOAMS 2008-A prospectus and prospectus supplement and other Offering Documents to investors and filing them with the SEC, BOA-Bank, BOA-Securities, and BOA-Mortgage knew that a material percentage of the mortgages BOA-Bank originated had material exceptions to the underwriting standards without sufficient compensating factors. BOA-Bank knew this because, among other reasons, its own Quality Assurance Department ("QA Department") conducted monthly reviews of mortgages after they were originated and funded to determine whether the mortgages substantially complied with BOA-Bank's underwriting standards.

60. Internal BOA-Bank Quality Assurance Reviews dated October 19, 2007, November 19, 2007, December 19, 2007, and January 18, 2008 (collectively the "QA Reports"), revealed that a material number of all the mortgages BOA-Bank originated during July, August, October, and November 2007 (i.e., the months in which BOA-Bank originated the mortgages collateralizing the BOAMS 2008-A securitization) had "serious or critical exceptions" to the underwriting standards. And even worse for investors in the BOAMS 2008-A Certificates, mortgages BOA-Bank originated through its Wholesale Channel had even higher rates of such material exceptions to the underwriting standards. A "serious or critical exception" to the

underwriting standards included errors that were not offset by legitimate compensating factors, such as defects concerning a borrower's employment status, debt level, credit score, occupancy status, income and assets as well as problems with property appraisals, violations of lending laws, and missing supporting documentation.

61.     Senior employees and management of BOA-Bank and BOA-Securities working on the BOAMS 2008-A securitization, including the BOA-Securities Managing Director and the BOA-Bank Senior VP that approved the prospectus supplement and signed the Officer Certifications, had access to the QA Reports and discussed them at meetings attended by the BOA-Securities Managing Director.  The QA Reports revealed that for the period July through December 2007, 7.5% of a statistically significant random sample of **all** the mortgages BOA-Bank originated had "serious or critical exceptions" to the underwriting standards.  Further, the percentage of mortgages with such material exceptions to the underwriting standards was even higher (as high as 10.5%) when government insured or guaranteed mortgages were excluded from the sample (neither of which was a type of mortgage included in the BOAMS 2008-A collateral pool), as reflected in the table below:

**Table 1 – Percentage of Non-Government-Backed Mortgages with Serious or Critical Underwriting Exceptions**

| July 2007 | August 2007 | September 2007 | October 2007 | November 2007 |
|-----------|-------------|----------------|--------------|---------------|
| 10.3% | 10.5% | 8.0% | 8.0% | 9.0% |

62.     The types of "serious or critical exceptions" detailed in the QA Reports related directly to the credit quality of the mortgages and the likelihood that they would be repaid in a timely fashion.  For instance, the three most prevalent exceptions noted in July 2007 were: (1) "borrower misrepresentation of employment;" (2) "borrower misrepresentation of stated

26

income," and (3) "occupancy issues."  Other "leading cause[s] of exceptions" in July were:

"insufficient funds/borrower investment," "borrower not employed as disclosed," "questionable

occupancy," and "inadequate documentation of income."  The "serious or critical" exceptions

noted in later months were nearly identical as reflected in the table below:

**Table 2 – Leading Types of Serious or Critical Underwriting Exceptions Identified**

| July 2007 | August 2007 | September 2007 | October 2007 | November 2007 |
|-----------|-------------|----------------|--------------|---------------|
| (1) employment misrepresentation | (1) stated income misrepresentation | (1) borrower misrepresentation | (1) stated income misrepresentation | (1) occupancy misrepresentation |
| (2) stated income misrepresentation | (2) employment misrepresentation | (2) questionable occupancy | (2) occupancy misrepresentation | (2) employment misrepresentation |
| (3) questionable occupancy | (3) questionable occupancy | (3) employment misrepresentation | (3) employment misrepresentation | (3) income stability issues |
| (4) insufficient funds/borrower investment | (4) undisclosed debt | (4) undisclosed debt | (4) insufficient information regarding income and assets | (4) undisclosed debt |

63.    The QA Reports also noted that of the exceptions identified above, nearly 40%

"are from loans with FICO scores greater than 720."  In other words, the QA Reports found that

the material exceptions to BOA-Bank's underwriting standards were not limited to mortgages

with poor credit scores.  Rather, nearly 40% of the material underwriting exceptions occurred in

mortgages with excellent credit scores – the very type of mortgages purportedly contained in the

BOAMS 2008-A collateral pool.

64.    Moreover, BOA-Bank's overall rate of serious or critical underwriting exceptions

increased sharply throughout 2006 and 2007.  The QA Reports showed that the overall rate of

serious or critical exceptions had skyrocketed from 2.2% in December 2005 to 7.6% in

November 2007.  That represented an increase of nearly **245%**.  The BOA-Bank Senior VP

admitted that she and others at BOA-Bank knew of the worsening trend prior to the closing of the BOAMS 2008-A securitization but were unable to determine its cause or remedy it.

65. The QA Reports also reflected that the Wholesale Channel was one of the worst offenders when it came to originating mortgages that did not substantially conform to BOA-Bank's underwriting standards. For example, BOA-Bank, BOA-Securities, and BOA-Mortgage knew from the QA Reports that 16% of the Wholesale mortgages originated through the Wholesale Channel in November 2007 had material underwriting exceptions that were not offset by adequate compensating factors. The table below shows the percentage of a statistically significant random sample of all the Wholesale mortgages BOA-Bank originated that had serious or critical exceptions to the underwriting standards:

**Table 3 - Percentage of Wholesale Mortgages with Serious or Critical Underwriting Exceptions**

| July 2007 | August 2007 | September 2007 | October 2007 | November 2007 |
|-----------|-------------|----------------|--------------|---------------|
| 9.0% | 7.6% | 8.3% | 9.0% | 16.0% |

66. Further, the QA reports showed a high correlation between mortgages that experienced delinquencies within a few months after origination ("early term delinquent mortgage") and mortgages that were originated with serious or critical exceptions to BOA-Bank's underwriting standards. Investors considered early term delinquent mortgages to be more serious than delinquencies that occurred later in a mortgage's life because, among other reasons, they were indicative of mortgage fraud. Table 4 below reveals that of the non-government insured or guaranteed mortgages that experienced a delinquency shortly after being originated during the period July through November 2007, between 19% to 24% had serious or critical exceptions to BOA-Bank's underwriting standards.

28

**Table 4 - Percentage of Early Term Delinquent Mortgages with Material Underwriting Exceptions**

| Channel | July 2007 | August 2007 | September 2007 | October 2007 | November 2007 |
|---------|-----------|-------------|----------------|--------------|---------------|
| All Non-Government-Backed | 22.0% | 19.1% | 20.1% | 24.1% | 20% |

67.     In summary, prior to the closing of the BOAMS 2008-A securitization in late

January 2008, BOA-Bank, BOA-Securities, and BOA-Mortgage knew that:

- The overall rate of serious or critical underwriting exceptions found in BOA-Bank originated mortgages had increased nearly 245% throughout 2006 and 2007 and despite its efforts, BOA-Bank could not stop the increase.

- A significant percentage of the mortgages BOA-Bank originated during the period July through November 2007 did not substantially comply with BOA-Bank's underwriting standards and did not have sufficient compensating factors, especially Wholesale mortgages.

- A significant proportion of the non-government backed mortgages suffering a delinquency within the first few months of origination during the period July through November 2007 had serious or critical exceptions to BOA-Bank's underwriting standards.

68.     Thus, prior to offering and selling the Certificates, BOA-Bank, BOA-Securities,

and BOA-Mortgage knew that a material percentage of the purportedly "prime" mortgages

collateralizing the BOAMS 2008-A securitization likely had material exceptions to the

underwriting standards without sufficient offsetting compensating factors.

69.     As a result, Defendants had no basis for their representations in the Offering

Documents that "**Each Mortgage …** will have been underwritten … to the standards set forth in

this prospectus…." and that "**each mortgage** …is underwritten in accordance with guidelines

established in Bank of America's Product and Policy Guides" and that each "Mortgage Loan was

underwritten in accordance with the applicable Underwriting Guidelines in effect at the time of

origination with exceptions thereto exercised in a reasonable manner."  Indeed, all the

29

information available to them at the time indicated that these representations were false. Yet, BOA-Bank, BOA-Securities, and BOA-Mortgage failed to disclose any of this material information to investors in the Certificates.

70.     Not only did Defendants know that a material percentage of the purportedly "prime" mortgages collateralizing the BOAMS 2008-A securitization likely had material exceptions to the underwriting standards without sufficient offsetting compensating factors, they had actual knowledge that there were specific mortgages in the BOAMS 2008-A collateral pool that BOA-Bank did not underwrite in accordance with its underwriting standards. For example:

- Prior to the closing of the BOAMS 2008-A securitization, BOA-Bank knew that it had provided Mortgage # *****71741 to a borrower in September 2007 who falsely claimed to be using the property as a primary residence. In fact, the Offering Documents and Preliminary Marketing Materials represented that this mortgage was for real estate being used as a primary residence. BOA-Bank knew, however, that the same borrower had also applied for another mortgage from BOA-Bank (through the exact same BOA-Bank employee – "Loan Officer FT") in September 2007 for a different property that he also claimed to be using as his primary residence. By December 2007 at the latest, BOA-Bank recognized the obvious fraud associated with this borrower and the BOA-Bank employee who assisted him in obtaining Mortgage # *****71741. Yet, Defendants still included Mortgage #*****71741 in the BOAMS 2008-A collateral pool. Not surprisingly, this mortgage suffered losses. Moreover, Defendants also included at least five other mortgages originated through Loan Officer FT in the BOAMS 2008-A collateral pool.

- Prior to the closing of the BOAMS 2008-A securitization, BOA-Bank knew that it had provided Mortgage # *****25530 to a borrower in November 2007 who in 2003 had tried to obtain a mortgage from BOA-Bank using a fraudulent social security number. Yet, Defendants still included Mortgage #*****25530 in the BOAMS 2008-A collateral pool.

- Prior to the closing of the BOAMS 2008-A securitization, BOA-Bank knew that it had provided Mortgage # *****24342 to a borrower in October 2007 who later that month tried to fraudulently obtain a home equity line of credit on that mortgage through BOA-Bank. The BOA-Bank employee involved in underwriting this mortgage ("Loan Officer JX") is currently under indictment for mortgage fraud. BOA-Bank terminated her in February 2008 (shortly after the closing of the BOAMS 2008-A securitization). Although BOA-Bank knew the borrower attempted to commit mortgage fraud in October 2007, it nevertheless

30

included Mortgage #*****24342 in the BOAMS 2008-A collateral pool, and it has suffered losses. Moreover, Defendants also included at least thirteen other mortgages originated through Loan Officer JX in the BOAMS 2008-A collateral pool, eight of which have suffered losses.

71.     In addition to the examples identified above, there were a significant number of additional mortgages in the collateral pool for the BOAMS 2008-A securitization that BOA-Bank did not underwrite in substantial compliance with its underwriting standards. Indeed, a material number of the mortgages in the BOAMS 2008-A collateral pool did not materially comply with BOA-Bank's underwriting standards. Upon information and belief, more than 40% of the 1,191 mortgages in the BOAMS 2008-A collateral pool did not substantially comply with BOA-Bank's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors. The most common defects in those mortgages concerned the borrowers' income, assets, credit score, employment, and intended occupancy, missing required documentation, and the purported value of the real estate secured by the mortgages (i.e. the same types of material defects identified in the QA reports). Thus, BOA-Bank, BOA-Securities, and BOA-Mortgage's representations in the Offering Documents that the mortgages were underwritten in conformance with BOA-Bank's underwriting standards were false and misleading.

72.     BOA-Bank's failure to originate mortgages in substantial compliance with its underwriting standards is not surprising giving the intense pressure placed on BOA-Bank employees involved in the origination process by BOA-Bank management. One BOA-Bank employee involved in the origination of mortgages in the BOAMS 2008-A collateral pool admitted that the emphasis at BOA-Bank was quantity not quality and that he was pressured to increase the number of applications he approved per week. He also admitted that he received

31

bonuses for surpassing mortgage production goals. Another such BOA-Bank employee admitted

that that she and her co-workers were instructed by her superiors that it was not their job to look

for fraud and stated that her job was "basically to validate the loans." She also admitted that her

superiors pressured her to process applications as quickly as possible but to keep her opinions to

herself.

73.     Because the statistics concerning the mortgage loans contained in the Offering

Documents and Preliminary Marketing Materials traced back to the BOA-Bank employees

involved in originating the mortgages, errors in origination frequently led to misrepresented

statistics concerning debt-to-income ("DTI") ratios, loan-to-value ("LTV") ratios, combined

loan-to-value ("CLTV") ratios, and occupancy status in the Offering Documents and Preliminary

Marketing Materials.

74.     In addition to those identified in Paragraph 70 above and Paragraph 104 below,

representative examples of mortgages in the BOAMS 2008-A collateral pool that did not

substantially comply with BOA-Bank's underwriting standards in place at the time they were

originated and did not have sufficient documented compensating factors and about which

Defendants made misrepresentations in the Offering Documents and Preliminary Marketing

Materials include:

- **Misrepresentation of Income Resulting in Underreported DTI ratio:** BOA-Bank originated Mortgage #*****70260 through the Wholesale Channel. BOA-Bank did not verify the claimed income or assets for this borrower who purported to be the director of a performance arts school in Los Angeles, California earning $234,000/year. When BOA-Bank attempted to verify the claimed employment status of the borrower, however, it was advised that the borrower was actually employed as a librarian for the school. According to the Bureau of Labor Statistics, the salary for librarians in the Los Angeles area at the 90th percentile is less than $85,000/year. Had BOA-Bank only considered a reasonable (i.e., at the 90th percentile) stated income, the borrower's DTI ratio would have been nearly 75%, which exceeded the maximum ratios allowed by the underwriting standards.

Moreover, the borrower's housing payment under the new mortgage increased over 225%. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve the issues. Defendants misrepresented in Preliminary Marketing Materials that the borrower had a DTI ratio of 26.3%.

- **Misrepresentation of Income Resulting in Underreported DTI ratio:** BOA-Bank originated Mortgage #*****49611 through the Wholesale Channel under its full documentation program, meaning that the underwriting standards in place at the time of origination required BOA-Bank to fully document the assets and income for the borrowers. Nevertheless, BOA-Bank improperly allowed the borrowers to simply claim purported rental income without any supporting documentation. Even worse, the borrowers' initial application in the mortgage file claimed a net rental **loss** of $1,500/month but BOA-Bank calculated the borrowers' income using a net rental **gain** of over $1,000/month. Had BOA-Bank not improperly included the undocumented rental income, the borrowers' DTI ratio would have been over 52.9%, which exceeded the maximum ratios allowed by the underwriting standards. The borrowers' DTI ratio would have been even higher had BOA-Bank used the original claimed rental loss. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve the issues. Defendants misrepresented in Preliminary Marketing Materials that the borrowers had a DTI ratio of 48.7%.

- **Misrepresentation of Intent to Occupy:** BOA-Bank originated Mortgage # *****38239 through the Wholesale Channel. Although the mortgage application claimed the borrower was purchasing this house as a primary residence, at the time of origination the borrower owned three other properties. The borrower claimed to be moving from his current primary residence – a four bedroom, three bathroom, single family residence – to a two bedroom condo farther away from his place of employment. Moreover, the borrower's housing payment under the new mortgage increased over 225%. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve these issues and treated the application as if it were for a primary residence. Defendants misrepresented in Preliminary Marketing Materials and a free writing prospectus that this mortgage was for a primary residence. This mortgage suffered losses.

- **Misrepresentation of Intent to Occupy:** BOA-Bank originated Mortgage # *****98912 through the Wholesale Channel. The mortgage file contained multiple applications, at least of one of which indicated that the home would be purchased as a second residence. The Underwriter's analysis form in the mortgage file also indicated that the application was submitted as a second residence. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve these issues and treated the application as if it were for a primary residence. Defendants misrepresented in Preliminary Marketing Materials and a free writing prospectus that this mortgage was for a primary residence.

- **Misrepresentation of Intent to Occupy:** BOA-Bank originated Mortgage # *****71486 through the Wholesale Channel. Although the mortgage application claimed that the purpose of the mortgage was to refinance the borrowers' primary residence, at the time of origination the borrowers also owned several other properties. Moreover, none of the income documentation (such as bank account statements and tax documents) matched the address of the claimed primary residence. In addition, the property appraisal in the mortgage file indicated that the subject property was vacant. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve these issues and treated the application as if it were for a primary residence. Defendants misrepresented in Preliminary Marketing Materials and a free writing prospectus that this mortgage was for a primary residence. This mortgage suffered losses.

- **Inflated Appraisal Resulting in Underreported LTV and CLTV Ratios:** BOA-Bank originated Mortgage #*****12483 through the Wholesale Channel based on an appraised price of $850,000, which resulted in an LTV ratio of 80% and a CLTV ratio of 95%. The appraisal report in the mortgage file dated October 16, 2007 indicated that the subject property had previously sold less than six months earlier for only $646,000. The appraisal report, which was unsigned, did not explain how the price could have increased $204,000 in less than six months. Had the appraised value been any less than $850,000, the LTV and CLTV ratios would have exceeded the maximums allowed under the underwriting guidelines in place at the time and the mortgage would have been declined. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve these issues and underwrote the mortgage using the appraised value of $850,000. Defendants misrepresented in Preliminary Marketing Materials and a free writing prospectus that this mortgage had an LTV ratio of 80% and a CLTV ratio of 95%. This mortgage suffered losses.

- **Inflated Appraisal Resulting in Underreported LTV and CLTV Ratios:** BOA-Bank originated Mortgage #*****78290 through the Wholesale Channel based on an appraised price of $1,500,000, which resulted in an LTV ratio of 66.7% and a CLTV ratio of 66.7%. The appraisal report in the mortgage file dated October 26, 2007 indicated that the subject property had been sold on September 28, 2007 for only $850,000. The appraisal report did not explain how the price could have increased $650,000 within a 30 day period. Had the recent sales price indicated in the appraisal report been used as the appropriate value of the subject property, the LTV and CLTV ratios would have exceeded the maximum allowed under the underwriting guidelines in place at the time and the mortgage would have been declined. Despite these obvious red flags, BOA-Bank did not take any steps to investigate or resolve these issues and underwrote the mortgage using the appraised value of $1,500,000. Defendants misrepresented in Preliminary Marketing Materials and a free writing prospectus that this mortgage had an LTV ratio of 66.7% and a CLTV ratio of 66.7%.

75.     Information obtained by BOA-Bank subsequent to the closing of the BOAMS 2008-A securitization also evidenced that mortgages in the BOAMS 2008-A collateral pool did not substantially comply with BOA-Bank's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors.  In particular, after some of the mortgages in the collateral pool became delinquent, BOA-Bank determined that at least 25 of the mortgages were not underwritten in substantial conformance with BOA-Bank's underwriting standards.  Representative examples of such mortgages are set forth in Paragraph 104 below.

### b. Defendants' Misstatements and Omissions Concerning the Performance of Mortgages Originated by BOA-Bank

76.     In addition to knowing about the problems with BOA-Bank's origination practices described above, BOA-Bank, BOA-Securities, and BOA-Mortgage also knew prior to providing the BOAMS 2008-A Offering Documents to investors and filing them with the SEC that the performance of BOA-Bank originated mortgages – especially those originated through the Wholesale Channel – was deteriorating sharply.

77.     BOA-Securities, BOA-Bank, and BOA-Mortgage knew that the market environment for the mortgages collateralizing the BOAMS 2008-A securitization was deteriorating during the latter half of 2007.  For instance, in December 2007, the BOA-Securities RMBS Trading Strategy Group created a presentation showing that jumbo prime mortgages eligible for a BOAMS securitization originated by BOA-Bank in 2007 were experiencing significantly higher rates of severe delinquencies than similar mortgages originated in prior years.  The December 2007 presentation, which was distributed among BOA-Bank and BOA-Securities employees including the BOA-Securities Trader, showed that jumbo prime mortgages

35

eligible for a BOAMS securitization originated in 2007 experienced significantly more serious delinquencies (and experienced them in far less time) than similar mortgages it originated in 2003, 2004, 2005, or 2006.  That presentation also revealed that the BOAMS securitizations completed in 2007 had performed significantly worse than similar RMBS sponsored by Defendants' competitors such as Citibank, Countywide, and Wells Fargo.  Specifically, the presentation showed that BOAMS securitizations backed by prime jumbo mortgages issued in 2007 were nearly six times more likely to include severely delinquent mortgages than similar securitizations issued in 2007 by Citibank, Countrywide, and Wells Fargo.

78.     In addition, the QA Reports revealed that BOA-Bank's QA Department also conducted reviews of nearly all early term delinquent mortgages.  These mortgages were not a part of the random sample discussed in Paragraphs 60 through 67 above because the QA Department separately reviewed every mortgage that missed its first payment and a random sample of the other early term delinquent mortgages.  For example, of the 146 delinquent mortgages that the QA Department reviewed in July 2007, the borrowers did not even make the first payment for 32 (22%) of the mortgages.  In August 2007, the borrowers did not make the first payment for 46 (31%) of the 149 delinquent mortgages reviewed.  In September 2007, the borrowers did not make the first payment for 53 (36%) of the 148 delinquent mortgages reviewed.  In October 2007, the borrowers did not make the first payment for 73 (50%) of the 147 delinquent mortgages reviewed, and in November 2007, borrowers did not make the first payment for 77 (75%) of 103 of the delinquent mortgages reviewed.

79.     The results of the QA Department's reviews of early term delinquent mortgages showed even greater problems with BOA-Bank's origination process.  First, they showed a

steadily worsening trend of borrowers not even making their first payment – from 22% in July

2007 to 75% in November 2007, which strongly suggested an increase in mortgage fraud.

Second, they showed that the Wholesale Channel accounted for a large number of the early term

delinquent mortgages.  As shown in Table 5 below, the Wholesale Channel accounted for

between 39% and 58% of all the non-government insured or guaranteed mortgages that went

delinquent shortly after being originated during the period July through November 2007.

**Table 5 – Percentage (Number) of Non-Government Backed Early Term Delinquent Mortgages per Channel**

| Channel | July 2007 | August 2007 | September 2007 | October 2007 | November 2007 |
|---------|-----------|-------------|----------------|--------------|---------------|
| All Non-Government-Backed | 100% (136) | 100% (131) | 100% (134) | 100% (112) | 100% (95) |
| Wholesale Channel Only | 39.0% (53) | 43.5% (57) | 46.3% (62) | 58.0% (65) | 55.8% (53) |

80.     The types of "serious or critical" underwriting defects found in the early term

delinquent mortgages analyzed in the QA Reports were consistent with those identified in the

random samples, including, among others, "insufficient funds," undisclosed debt," "questionable

occupancy," "borrower not employed as disclosed," "inadequate documentation of funds," and

"inadequate documentation of income."

81.     In addition to the QA Reports, BOA-Bank also created reports detailing the

performance of all the mortgages originated by BOA-Bank ("Performance Reports").

Employees of BOA-Bank, BOA-Securities, and BOA-Mortgage involved in the BOAMS 2008-

A securitization, including the BOA-Securities Managing Director and the BOA-Bank Senior

VP, had access to and regularly reviewed the Performance Reports prior to the closing of the

BOAMS 2008-A securitization.  Among other things, the Performance Reports tracked the

number of mortgages originated by BOA-Bank that had ever been 90 or more days delinquent

(an "Ever 90" delinquency) during a given quarter, and it grouped the mortgages based on the quarter in which they were originated. For instance, the Performance Report available to the BOA-Securities Managing Director and the BOA-Bank Senior VP in January 2008 prior to the closing of the BOAMS 2008-A securitization (the "Q4 2007 Performance Report") showed, among other things, the number of mortgages originated in the first quarter of 2007 that had experienced an Ever 90 delinquency within: (i) the first three months after origination, (ii) the first six months after origination; and (iii) the first nine months after origination. It also showed the number of mortgages originated in the second quarter of 2007 that had experienced an Ever 90 delinquency within: (i) the first three months after origination, and (ii) the first six months after origination. And for mortgages BOA-Bank originated in the third quarter of 2007, the Q4 2007 Performance Report showed the number of those mortgages that had experienced an Ever 90 delinquency within the first three months after origination, i.e. those mortgages for which the borrower did not make one of his or her first three payments. The Performance Reports also isolated the above metrics by origination channel so that the reader could analyze the performance of mortgages originated through the Wholesale Channel or Direct Channel.

82.    The Q4 2007 Performance Report provided even more red flags to Defendants concerning the performance of mortgages originated through BOA-Bank's Wholesale Channel during the same period as those in the BOAMS 2008-A collateral pool, and confirmed that Wholesale mortgages had experienced disproportionately more Ever 90 delinquencies than mortgages BOA-Bank originated through its Direct Channel. Specifically, it showed that while BOA-Bank only originated 24.7% of its total mortgages in the third quarter of 2007 through the Wholesale Channel, those mortgages accounted for over 43% of the mortgages that experienced

38

an Ever 90 delinquency within the first three months after origination.  In other words, of the mortgages BOA-Bank originated in the third quarter of 2007 for which the borrower failed to make one of his or her first three payments, the Wholesale Channel accounted for nearly ½ of them even though it only accounted for ¼ of the total number of mortgages originated by BOA-Bank in that quarter.  Moreover, the Q4 2007 Performance Report revealed that the percentage of Wholesale mortgages originated in the third quarter of 2007 that experienced an Ever 90 delinquency within the first three months after origination was over double the percentage of other mortgages originated in the third quarter of 2007 that experienced an Ever 90 delinquency within the first three months after origination.

83.     The Q4 Performance Report revealed similar poor performance among Wholesale mortgages originated in the second quarter of 2007.  Specifically, it showed that although BOA-Bank originated only 22% of its total mortgages through the Wholesale Channel during the second quarter of 2007, those mortgages accounted for 42% of the BOA-Bank mortgages that experienced an Ever 90 delinquency within the first six months after origination.  Moreover, the Q4 2007 Performance Report revealed that the proportion of Wholesale mortgages originated in the second quarter of 2007 that experienced an Ever 90 delinquency within the first six months after origination was more than **154%** higher than the proportion of other mortgages originated in the second quarter of 2007 that experienced an Ever 90 delinquency within the first six months after origination.

84.     In sum, the Q4 Performance Report provided Defendants with abundant evidence indicating that mortgages BOA-Bank originated through its Wholesale Channel in the latter half of 2007 (i.e. the same period as those in the BOAMS 2008-A collateral pool) were performing

39

markedly worse than mortgages originated through BOA-Bank's Direct Channel. Further, the report also revealed that the Wholesale mortgages BOA-Bank originated in the third quarter of 2007 were performing dramatically worse than similar Wholesale mortgages BOA-Bank originated during any other period dating back to 2005. Specifically, Wholesale mortgages originated in the third quarter of 2007 experienced **600%** more Ever 90 delinquencies than similar Wholesale mortgages originated by BOA-Bank during any other quarter dating back to at least the fourth quarter of 2005.

85.     Defendants had no basis to believe that the Wholesale mortgages in the BOAMS 2008-A collateral pool would perform any better than the general population of Wholesale mortgages originated by BOA-Bank during the same time period. Yet, they did not disclose any of the information from the Performance Reports in the Offering Documents for the BOAMS 2008-A Certificates, nor did they include any disclosure in the Offering Documents about potential increased risk from Wholesale mortgages.

86.     Defendants also knew that Wholesale mortgages caused more losses to investors in BOA-Bank sponsored RMBS in 2007 than mortgages BOA-Bank originated through other channels. For example, on December 10, 2007, the BOA-Securities Trader responsible for trading certain of the Certificates and other similar RMBS sent an email to the BOA-Bank Senior VP and several other BOA-Bank and BOA-Securities employees with the subject "BofA 2007 Early Sever[e] Delinquency Analysis." The BOA-Securities Trader expressed concern about the quality and performance of BOA-Bank sponsored RMBS issued in 2007 and warned his colleagues that:

> Performance of BofA originated loans has declined sharply. … It is imperative that we remain proactive in researching our skyrocketing delinquency issues … We have been doing some

40

analysis … into all BofA originated loans that were securitized [by BOA-Bank and BOA-Securities] over the course of 2007. In looking at the pay histories post securitization, what has become apparent is a number of loans with questionable payment histories that indicate possible instances of fraud.

*         *         *

If we are to maintain our originate-and-distribute platform we must take action on our mounting delinquencies…

87.     In a response to the December 10, 2007 email, the BOA-Bank Senior VP conceded that, "the performance of [recent BOA-Bank originated mortgages] is worse than prior vintages." She also forwarded the December 10, 2007 email to her superior and others at BOA-Bank. In an email to a member of BOA-Bank's QA Department dated that same day concerning BOA-Bank sponsored RMBS, the BOA-Bank Senior VP acknowledged, "The performance of these deals is deteriorating at a rapid pace, we are attempting to find out the reason why so many of these loans are going dlq [delinquent] so early in the deal's life."

88.     On December 18, 2007, a member of BOA-Bank's Risk Solutions group sent an email to the BOA-Bank Senior VP advising that BOA-Bank's QA Department had reviewed about 20% of the mortgages identified in BOA-Securities Trader's December 10 email and found that "most are in wholesale." She also recommended that BOA-Bank take additional steps to "understand if there is fraud/processing errors/policy issues et al" causing the increased delinquencies.

89.     On January 15, 2008, the BOA-Securities Trader sent a follow-up email to his previous email of December 10. He sent this email to several members of BOA-Bank and BOA-Securities management, including the BOA-Bank Senior VP and the BOA-Securities Managing Director in charge of the group with responsibility for the BOAMS 2008-A securitization and the

41

related Offering Documents.  In the January 15 email, the BOA-Securities Trader provided a dire

assessment of the mortgages BOA-Bank originated through the Warehouse Channel and

included in RMBS issued in 2007:  "Collateral performance, comparative to historical BofA

origination, continues to be **abysmal** with resolution still outstanding." (Emphasis added).  He

then explained that of the mortgages that served as collateral for BOA-Bank sponsored RMBS

sold in 2007 that failed to make their first payment (known as a "first payment default") or one

of their first few payments (known as an "early payment default"), 77% were originated through

BOA-Bank's Wholesale Channel.  He also reported that of the mortgages that served as

collateral for BOA-Bank sponsored RMBS sold in 2007 that were "severely delinquent," BOA-

Bank originated 80% of them through the Wholesale Channel.  Finally, the BOA-Securities

Trader expressed his gratitude that BOA-Bank had finally started to close its Wholesale Channel,

thus taking steps to reduce the number of bad mortgages it originated in the future, but he warned

that:

> [T]he poorly originated product from 2007 still needs ownership for
> the origination flaws and responsibility for the poor performance
> must be pushed back to the origination side of the business.  The
> pricing provided for product from the securitization side of the
> business was never intended for Early payment Default or First
> payment default loans.  The "originate to distribute" model is broken
> and this is one of the important first steps to fix the model.

90.     Rather than accepting the BOA-Securities Trader's recommendation that the

origination side of the business, i.e. BOA-Bank, take "ownership" and "responsibility" of the

poorly-performing Wholesale mortgages, Defendants filled the collateral pool for the BOAMS

2008-A securitization with over 70% of such mortgages calling the offering "prime" regardless.

91.     Defendants did not disclose in the Offering Documents the large proportion of

Wholesale mortgages in the BOAMS 2008-A collateral pool.  In fact, Defendants did not include

any information in the Offering Documents alerting potential investors that over 70% of the mortgages collateralizing the BOAMS 2008-A securitization were originated through the riskiest of BOA-Bank's origination channels even though it was well known within BOA-Bank and BOA-Securities that the Wholesale Channel had significant problems. For instance, a December 2007 BOA-Securities training presentation advised that "retail originations are considered to be less risky" than wholesale originations. Moreover, even BOA-Corp.'s Chief Executive Officer Kenneth Lewis knew that Wholesale mortgages were riskier than mortgages originated through the Direct Channel. During the July 19, 2007 BOA-Corp. earnings call for the second quarter of 2007, Mr. Lewis responded to an investor question regarding mortgage origination channels by proclaiming that mortgages originated through Wholesale Channel "*broker[s] tend[] to be toxic waste.*"

92. Even worse, on at least one occasion, a BOA-Securities salesman affirmatively misrepresented to an investor that **none** of the mortgages in the collateral pool for the BOAMS 2008-A securitization were originated from the Wholesale Channel. Specifically, in a January 29, 2008 communication sent over the Bloomberg messaging system, a BOA-Securities salesman located in Chicago, Illinois misrepresented to Shay that the BOAMS 2008-A securitization "is a 100% Retail pool. [W]e no longer do Wholesale and never did Correspondent." This representation was materially false and misleading because over 70% of the collateral pool for the BOAMS 2008-A securitization consisted of Wholesale mortgages.

93. To the extent that Defendants provided any information to potential investors in the Certificates concerning the number of mortgages in the BOAMS 2008-A collateral pool that BOA-Bank originated through the Wholesale Channel, they did not do so publicly. Rather,

Defendants provided certain selected investors with preliminary data from which those investors could have attempted to approximate the concentration of Wholesale Channel mortgages in the collateral pool. The Defendants' selective disclosure of this information was in itself a violation of the federal securities laws (*see* Section 5(b)(1) of the Securities Act of 1933, 15 U.S.C. § 77(e)(1)), because it hid such information from other investors.

94. Defendants further misled investors by representing in the base prospectus for the BOAMS 2008-A Certificates that BOA-Bank still originated wholesale loans even though BOA-Bank had closed the Wholesale Channel months earlier. Specifically, the base prospectus stated that, "Bank of America also originates loans indirectly through its wholesale channel…." Internal emails, such as the January 15, 2008 email sent by the BOA-Securities Trader discussed above in Paragraph 89 ("While I appreciate that bofa [BOA-Bank] has taken the necessary steps to close the wholesale channel …, the poorly originated product from 2007 still needs ownership for the origination flaws…"), indicate that BOA-Bank closed the Wholesale Channel in part because it knew mortgages originated through that channel were riskier than similar mortgages originated through other channels. And other internal BOA-Bank documents indicate that the decision to close the Wholesale Channel was based in part on a desire to "reduce risk profile (legal, regulatory, loan performance)" and "focus more on quality of relationships [rather] than quantity of loans" contrary to BOA-Bank's past behavior. (Emphasis added) Indeed, a former Managing Director of BOA-Securities' Residential Mortgage Research Group explained that BOA-Bank closed the Wholesale Channel "because it's tough to control what comes through those channels" in terms of quality. Upon information and belief, the decision to close the Wholesale Channel was a leading cause of BOA-Bank and BOA-Securities' decision to

44

collateralize the BOAMS 2008-A securitization with an unusually high rate of mortgages from that channel as evidenced by the large proportion of Wholesale Channel mortgages in the collateral pool that were originated in October and November 2007 after BOA-Bank decided to close the Wholesale Channel (more than 80% of the mortgages originated in October and November in the collateral pool were from Wholesale Channel).  Put simply, investors did not know that they were getting the last scraps of this discarded, poorly-performing, channel.

95.    Thus, prior to the closing of the BOAMS 2008-A securitization, BOA-Bank, BOA-Securities, and BOA-Mortgage knew the following information evidencing that the mortgages in the BOAMS 2008-A collateral pool were not of the credit quality an investor would have expected in a purportedly prime securitization:

- Jumbo prime mortgages originated by BOA-Bank in 2007 that were eligible for a BOAMS securitization (like all of the mortgages in the BOAMS 2008-A collateral pool) experienced significantly higher rates of severe delinquencies than similar mortgages originated in prior years;

- BOAMS securitizations completed in 2007 had been performing significantly worse than similar RMBS sponsored by competitors;

- The percentage of delinquent mortgages originated by BOA-Bank for which the borrower did not even make his or her first payment had increased significantly during the period July through November 2007 (the same period in which BOA-Bank originated the mortgages in the BOAMS 2008-A collateral pool);

- Over 70% of the collateral pool for the BOAMS 2008-A securitization consisted of mortgages originated through BOA-Bank's Wholesale Channel;

- The Wholesale Channel accounted for a significant proportion (nearly half) of the non-government backed mortgages originated by BOA-Bank that suffered a delinquency within the first few months of origination during the period July through November 2007 (the same period in which BOA-Bank originated the mortgages in the BOAMS 2008-A collateral pool);

- The Q4 2007 Performance Reports revealed a significant increase in the amount of Ever 90 delinquencies among Wholesale mortgages originated in the second and third quarters of 2007, and that those Wholesale

45

mortgages experienced disproportionately more Ever 90 delinquencies than mortgages BOA-Bank originated directly;

- Nearly 80% of the severely delinquent mortgages in collateral pools for RMBS sponsored by BOA-Bank in 2007 were originated through BOA-Bank's Wholesale Channel; and

- BOA-Bank decided to close its Wholesale Channel in October 2007 based in part on a desire to reduce the risks caused by "poor loan performance."

96.     Yet, BOA-Bank, BOA-Securities, and BOA-Mortgage failed to disclose any of this information in the Offering Documents contrary to the requirements of the federal securities laws and investor rights.  This information was material because it would have influenced reasonable investors' decisions whether to purchase the Certificates, and, if so, at what price. This type of information, which directly related to the quality of the mortgages collateralizing the Certificates and the likelihood of the Certificates suffering losses, was exactly the type of information that would have been important to reasonable investors when deciding whether to purchase the Certificates.

97.     Defendants further misled investors by specifically directing them to performance information concerning previous BOAMS prime securitizations sponsored by BOA-Bank and underwritten by BOA-Securities as a useful comparison for analyzing a potential investment in the Certificates.  Specifically, the prospectus supplement for the BOAMS 2008-A securitization stated, "Information concerning the Sponsor's [BOA-Bank's] prior residential mortgage loan securitizations involving … mortgage loans underwritten in accordance with the Sponsor's general underwriting standards" is available on BOA-Bank's free, publicly available internet website.  This information (referred to as "Static Pool Data") included summary collateral information for previous BOAMS securitizations as well as delinquency and loss information for those securitizations.

46

98.     Although the supplemental prospectus advised investors that the Static Pool Data "may not be indicative of the future performance" of the BOAMS 2008-A securitization, Defendants misled investors by stating that the cause of any such variance would be "factors beyond the Sponsor's [BOA-Bank's] control, such as unusually robust housing prices, low interest rates, and changes in product type."  Defendants did not alert investors to the fact that the Static Pool Data was not a relevant comparison to the BOAMS 2008-A Securitization because of factors squarely within the Defendants' control and/or knowledge such as the fact that the BOAMS 2008-A Securitization contained over 50% more Wholesale mortgages than previous prime BOAMS securitizations.  For example, only 42% (270) of the mortgages in the collateral pool for the BOAMS 2007-4 securitization and 45% (378) of the mortgages in the collateral pool for the BOAMS 2007-3 securitization were Wholesale mortgages.  This omission deprived investors from knowing the material fact that the BOAMS 2008-A securitization was not likely to perform in the same manner as previous BOAMS prime securitizations.  Not surprisingly, as of April 2013, the BOAMS 2008-A securitization had suffered more principal losses than the previous two BOAMS securitizations combined.

### c.     Defendants' False Statements and Omissions Concerning Self-Employed and Self-Employed Reduced Documentation Borrowers

99.     In order to expedite the underwriting process so that it could originate mortgages more quickly to keep its securitization engine running, BOA-Bank offered borrowers the chance to obtain a mortgage based simply on their claimed income and assets without any verification by BOA-Bank.  One of the programs through which BOA-Bank provided such mortgages was called the PaperSaver program.

47

100. Set forth in the prospectus for the BOAMS 2008-A securitization was the following description of BOA-Bank's underwriting standards regarding the required documentation to support a mortgage application:

> In assessing an applicant, Bank of America requires supporting documentation (or other verification) for all material data provided by the applicant, such as income and source of down payment, unless the applicant qualifies for one of the Accelerated Processing Programs discussed below…. such as …PaperSaver (R) (also known as Threshold and/or Rapid Plus)…
>
>       *           *           *
>
> Under Bank of America's "PaperSaver(R)" documentation program, verification of the applicant's stated income and stated assets is not requested (**with the exception** of self-employed applicants who are required to sign the IRS form 4506-T (Request for Transcript of Tax Returns)) (emphasis added).

101. These representations advised investors that BOA-Bank did not verify the stated income and stated assets for borrowers under the PaperSaver program "**with the exception"** of self-employed borrowers, for whom they conducted verification using signed Internal Revenue Service's Form 4506-T.

102. The Offering Documents failed to disclose, however, that when originating mortgages for self-employed borrowers under the PaperSaver program, BOA-Bank failed to use (and in more than 17% of cases failed to even obtain) the IRS Form 4506-T to receive tax return transcripts for the borrowers from the IRS. Thus, contrary to the representations set forth in Paragraph 100, BOA-Bank did not perform any "verification" of a purportedly self-employed borrower's income. Moreover, for many mortgages, BOA-Bank did not even collect the IRS Form 4506-T from the borrowers that would have allowed it to do so, which necessarily meant that the mortgage was not underwritten in substantial conformance with BOA-Bank's underwriting standards. In addition, an internal BOA-Bank "Questions and Answers" guide

48

prepared for its mortgage underwriters specifically instructed them that they were not required to

conduct any investigation in circumstances where they had concerns that a borrower in the

PaperSaver mortgage program lied about being a salaried employee when they were actually

unemployed or self-employed.  Specifically, the guide stated:

> Q:  If the applicant indicates on the applications that he or she is
> salaried but the business name or other application information
> suggests he or she is actually self-employed, is additional investigation
> required to resolve the potential undisclosed self-employment?
>
> A:  No, because PaperSaver eligibility is not affected by whether
> or not an applicant is self-employed.  Applicant income is not
> documented in either situation.

103.    Given the BOA-Bank Senior VP's position and responsibilities (and her receipt of

the QA Reports), she must have known about BOA-Bank's failure to obtain and use IRS 4506-T

forms in connection with the origination of PaperSaver mortgages.

104.    Because BOA-Bank failed to obtain and use IRS 4506-T forms in connection with

the origination of PaperSaver mortgages, it was possible for borrowers in the PaperSaver

mortgage program to falsely claim they earned large salaries justifying a jumbo mortgage when

they were in fact self-employed, otherwise employed, or even unemployed.  Investors would

obviously not consider mortgages provided to such borrowers to be prime.  Not surprisingly, this

happened on numerous occasions in connection with mortgages in the BOAMS 2008-A

collateral pool.  This caused investors in the Certificates to suffer losses.  For example:

- BOA-Bank included Mortgage # *****01389 in the collateral pool.  That
  mortgage was for $692,000 to a borrower who claimed to earn nearly
  $225,000/year working for a construction company with five years of experience.
  During origination, BOA-Bank did not obtain the borrower's tax transcripts using
  an IRS Form 4506-T (and, upon information and belief, did not even obtain such
  a form from the borrower).  After the mortgage suffered losses, BOA-Bank
  contacted the construction company for which the borrower claimed to have
  worked and was advised that the borrower had never worked for the company.

49

- BOA-Bank included Mortgage # *****20727 in the collateral pool. That mortgage was for $612,800 to a borrower who claimed to earn $201,000/year working for an auto repair company with five years of experience. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T (and, upon information and belief, did not even obtain such a form from the borrower). After the mortgage suffered losses, BOA-Bank contacted the company for which the borrower claimed to have worked and was advised that the borrower had never worked for the company.

- BOA-Bank included Mortgage # *****27531 in the collateral pool. That mortgage was for $960,000 to a borrower who claimed to earn $360,000/year as the owner of a landscaping company. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T (and, upon information and belief, did not even obtain such a form from the borrower). After the mortgage suffered losses, BOA-Bank determined that the company the borrower claimed to own never existed.

- BOA-Bank included Mortgage # *****79062 in the collateral pool. That mortgage was for $744,000 to a borrower who claimed to earn $753,000/year as the owner of a house cleaning company. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T (and, upon information and belief, did not even obtain such a form from the borrower). After the mortgage suffered losses, BOA-Bank determined that the company the borrower claimed to own never existed.

- BOA-Bank included Mortgage # *****17702 in the collateral pool. That mortgage was for $996,000 to a borrower who claimed to earn nearly $275,000/year working for a mortgage broker. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T. After the mortgage suffered losses, BOA-Bank determined that the borrower never worked for the employer identified on her mortgage application.

- BOA-Bank included Mortgage # *****05322 in the collateral pool. That mortgage was for $496,000 to a borrower who claimed to earn $111,000/year as the owner of a catering company as well as $35,000/year as a baker at a college. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T. After the mortgage suffered losses, BOA-Bank determined that the company the borrower claimed to own never existed and that she was never employed by the college identified on her mortgage application.

- BOA-Bank included Mortgage # *****44869 in the collateral pool. That mortgage was for $605,600 to a borrower who claimed to earn $186,000/year working for an internet company. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T (and, upon information and belief, did not even obtain such a form from the borrower). After the mortgage suffered losses, BOA-Bank determined that the borrower only earned approximately $65,000/year when she applied for the mortgage.

50

- BOA-Bank included Mortgage # *****10562 in the collateral pool. That mortgage was for $450,000 to a borrower who claimed to earn nearly $125,000/year working for a nursing home. During origination, BOA-Bank did not obtain the borrower's tax transcripts using an IRS Form 4506-T (and, upon information and belief, did not even obtain such a form from the borrower). After the mortgage suffered losses, BOA-Bank determined that the borrower only earned approximately $77,000/year when she applied for the mortgage.

105. Reduced documentation programs like PaperSaver that allowed a borrower to simply state his or her income and assets added a layer of risk to a mortgage, increasing the chance that the borrower would not make the required payments in a timely fashion. Allowing a self-employed borrower to obtain a PaperSaver mortgage added yet another layer of risk to the mortgage because self-employed borrowers were more likely to become delinquent or default on their mortgages than similar salaried borrowers. Moreover, by not obtaining tax return transcripts for self-employed borrowers under the PaperSaver program, contrary to the prospectus language set forth in Paragraph 100 and by not requiring its employees to investigate suspicious claims of employment, BOA-Bank also increased the risk that it provided PaperSaver mortgages to purportedly self-employed borrowers who were not even employed, thus further increasing the risk that the borrower would not make the required payments in a timely fashion.

106. Defendants failed to disclose in the Offering Documents the increased risks associated with PaperSaver mortgages, mortgages provided to self-employed borrowers, and PaperSaver mortgages provided to self-employed borrowers. Further, they failed to disclose the number or proportion of the supposedly "prime" mortgages in the BOAMS 2008-A collateral pool that were provided to self-employed borrowers or to self-employed borrowers with a PaperSaver mortgage. Thus, not only were the Offering Documents and Preliminary Marketing Materials silent as to the fact that 22% of the mortgages in the BOAMS 2008-A collateral pool

51

were provided to purportedly self-employed borrowers, they also failed to disclose that over 15% of the BOAMS 2008-A collateral pool consisted of mortgages given to self-employed borrowers with a PaperSaver mortgage.

107.     The effects of these undisclosed layered risks were apparent in the performance of the supposedly "prime" mortgages collateralizing the BOAMS 2008-A securitization. Mortgages provided to self-employed borrowers in the BOAMS 2008-A collateral pool suffered disproportionately more losses than those provided to salaried employees, and PaperSaver mortgages provided to self-employed borrowers performed disproportionality worse than non-PaperSaver mortgages provided to self-employed borrowers.  Further, PaperSaver mortgages provided to self-employed borrowers also performed disproportionately worse than PaperSaver mortgages provided to salaried borrowers.  Specifically, of the mortgages in the BOAMS 2008-A collateral pool, nearly 19% of those provided to self-employed borrowers suffered losses as of June 2013, while only about 16% of the mortgages provided to salaried employees suffered losses.  Moreover, as of June 2013, approximately 23% of the PaperSaver mortgages provided to self-employed borrowers suffered losses, while only about 11% of the non-PaperSaver mortgages provided to self-employed borrowers in the collateral pool suffered losses. Comparatively, only about 11% of the PaperSaver mortgages provided to salaried borrowers in the BOAMs 2008-A collateral pool suffered losses as of June 2013.

     **d.  Defendants' Omissions Concerning The Failure to Conduct Due Diligence**

108.     As the securities underwriter for the BOAMS 2008-A securitization, BOA-Securities had a duty to conduct due diligence prior to offering or selling the Certificates to investors.  This duty arose out of general industry practice and custom, BOA-Securities' own

policies and procedures, and the federal securities laws, which provide securities underwriters an affirmative defense to investor claims concerning false statements in prospectuses and other offering documents if the underwriters can show they made a reasonable investigation into the accuracy and completeness of the offering documents and reasonably believed them to be true and accurate. *See, e.g.,* Section 11(b) of the Securities Act of 1933, 15 U.S.C. § 77k(b); Rule 176 under the Securities Act of 1933, 17 C.F.R. § 230.176 (2007).

109. BOA-Securities' policies and procedures in place during 2007 and early 2008 acknowledged that when BOA-Securities "places its name on a prospectus or offering memorandum, … it [must] undertake the inquiry necessary to obtain reasonable assurance that the disclosure in the prospectus or offering memorandum is complete and accurate." These policies and procedures also warned BOA-Securities employees that those involved in a securities offering face liability "if the offering document contains an untrue statement of material fact or omits to state a material fact."

110. BOA-Securities' policies and procedures further directed its employees that:

> In preparing offering documents, the investment banker should be concerned not only with factors presently affecting the issuer, but also those which may arise in the future. Thus in performing due diligence, the investment banker must determine those events which may be material to the issuer in the future and, where appropriate, ensure disclosure of such potential events in the prospectus. Investment bankers should err on the side of caution in determining whether information is material and should be disclosed.

111. In addition, BOA-Securities' policies and procedures (and practice) in place during the late 2007 early 2008 period mandated that when it served as underwriter for RMBS backed by prime mortgages (such as the BOAMS 2008-A securitization), it examine a

"statistically significant sample of adverse and randomly selected" mortgages serving as collateral for a securitization in order to determine whether those mortgages conformed to the credit and compliance underwriting standards set forth in the relevant prospectus and prospectus supplement. This was commonly referred to as a file review or "Loan Level Due Diligence." BOA-Securities' written policies and procedures regarding Loan Level Due Diligence in place during the relevant period did not distinguish between RMBS backed by mortgages originated by BOA-Bank and those backed by mortgages originated by other entities. This approach was consistent with the representations in the Underwriting Agreement setting forth that "in connection with all aspects" of the BOAMs 2008-A securitization, BOA-Mortgage, BOA-Bank, and BOA-Securities "each have an arm's-length business relationship[]" with each other.

112.    This was BOA-Securities' policy for good reason. It was standard industry practice during all times relevant to this Complaint among underwriters of RMBS to perform Loan Level Due Diligence on a statistically valid sample of the mortgages in the collateral pool for each securitization. BOA-Securities' practice (as well as industry practice) mandated that mortgages identified during Loan Level Due Diligence as not conforming to the applicable underwriting standards were to be kicked out of the collateral pool and returned to the originator.

113.    Reasonable investors in the Certificates would have expected that BOA-Securities complied with standard industry practice and conducted Loan Level Due Diligence in connection with the BOAMS 2008-A securitization, or at a minimum, that BOA-Securities would have disclosed the fact that it did not conduct any Loan Level Due Diligence so that the investors could take that into account when determining whether to purchase the Certificates and, if so, at what price.

114.    BOA-Securities' policies and procedures in place during the relevant period also required it to obtain an automated valuation model report ("AVM") for 100% of the mortgages serving as collateral for the securitization in order to test the reasonableness of the property appraisal used in the original underwriting of the mortgage.  AVMs estimated the value of a property using an algorithm that considered various components, including data regarding the subject property and data regarding sales of comparable properties.  The AVMs used by BOA-Securities in late 2007 and early 2008 also included various fraud checks attempting to identify mortgages with suspicious characteristics indicative of a fraudulently obtained mortgage.  BOA-Securities was supposed to use the results of the AVMs, including the fraud checks, to kick additional risky mortgages out of the collateral pool for a securitization.

115.    Underwriters, such as BOA-Securities, conducted Loan Level Due Diligence and obtained AVM's to ensure that representations concerning the quality of the mortgages and statistics concerning the characteristics of the mortgages in offering documents and other marketing materials were correct.  Prior to the BOAMS 2008-A securitization, BOA-Securities conducted Loan Level Due Diligence on a sample of at least 10% of the mortgages collateralizing a BOAMS securitization.  For example, BOA-Securities conducted Loan Level Due Diligence on such a sample of mortgages collateralizing the BOAMS 2007-3 securitization, which closed on or about August 30, 2007; the BOAMS 2007-2 securitization, which closed on or about April 27, 2007; and the BOAMS 2007-1 securitization, which closed on or about February 27, 2007.  Upon information and belief, BOA-Securities also obtained AVM's for these securitizations.

116.    The Loan Level Due Diligence conducted for those three securitizations found significant problems with the quality of the mortgages in the collateral pools and numerous errors where the data in the mortgage files did not match the statistics in the offering documents and marketing materials.  For instance, the Loan Level Due Diligence revealed that over 40% of the mortgages sampled did not materially conform to BOA-Bank's underwriting standards.  Of those, BOA-Bank purportedly found compensating factors that offset the defects for many of the mortgages, but for as many as 7.3% of each sample, it could not find sufficient compensating factors and the mortgages were slated to be removed from the collateral pools.

117.    The Loan Level Due Diligence also revealed that a significant amount of the statistics concerning the mortgages in the offering documents and other marketing materials did not accurately reflect the information in the underlying mortgage files.  In other words, the Loan Level Due Diligence showed that statistics concerning the mortgages contained in the offering documents and other marketing materials regarding such material characteristics as the occupancy status, DTI ratio, LTV ratio, CLTV ratio, and credit score associated with the mortgages were materially false.  Further, the AVM's obtained by BOA-Securities showed that the appraisals used in originating the mortgages in the collateral pools were often inflated.  For example, the AVM's BOA-Securities obtained for the BOAMs 2007-3 securitization showed that as much as 50% of the appraisals used to originate the mortgages in the collateral pool were inflated.  Had the appraisals not been inflated, several of the mortgages would not have appeared to comply with BOA-Bank's underwriting standards.  Upon information and belief, the BOA-Securities Managing Director received or had access to the results of the previous Loan Level Due Diligence and AVM's prior to the closing of the BOAMs 2008-A securitization.

118.    The BOA-Securities Trader, who had responsibility for acquiring certain of the Certificates from BOA-Bank for resale to investors, admitted that his expectation was that either BOA-Securities or BOA-Bank would have conducted Loan Level Diligence on a sample of mortgages in the collateral pool for the BOAMS 2008-A securitization because "it's a typical standard process" when putting together a securitization because "you want to examine it carefully to understand that what they're selling you … you want to get comfortable with their origination, the underwriting so that you're not buying something that you think is something and it ends up being something different."  He further admitted that had he known that Loan Level Due Diligence was not done on the collateral pool for the BOAMS 2008-A securitization, the price he was willing to pay BOA-Bank to obtain the Certificates may have been lower.  The price, if any, other reasonable investors would have been willing to pay for the Certificates would also have been affected had they known the truth.

119.    Contrary to standard industry practice, BOA-Securities' policies and procedures, and their common practice up until late 2007, neither BOA-Securities nor BOA-Bank conducted Loan Level Due Diligence on the mortgages in the BOAMS 2008-A collateral pool to determine whether those mortgages conformed to BOA-Bank's underwriting standards as represented in the Offering Documents or to confirm that the statistics concerning the mortgages in the Offering Documents and Preliminary Marketing Materials were accurate.  Nor did they obtain any AVMs or fraud checks for the mortgages serving as collateral for the BOAMS 2008-A securitization. Both the BOA-Securities Managing Director and the BOA-Bank Senior VP knew this.  This significantly increased the risk that those mortgages were not of the quality represented in the Offering Documents and expected by investors in a purportedly "prime" securitization.

57

120.     Because neither BOA-Securities nor BOA-Bank conducted any Loan Level Due Diligence or obtained any AVMs or fraud checks in connection with the BOAMS 2008-A securitization, they had no basis for the representations in the Offering Documents that the mortgages in the pool conformed to BOA-Bank's underwriting standards.  For the same reasons, the BOA-Bank Senior VP, and her superior, had no basis for signing the Officer Certifications attesting that the Offering Documents did not contain any material misstatements or fail to disclose any material information nor for executing the PSA, which made representations concerning the quality of the mortgages in the BOAMS 2008-A collateral pool and that each mortgage was underwritten in compliance with BOA-Bank's underwriting standards.

121.     Even worse, at the same time that BOA-Securities and BOA-Bank made the decision to forgo Loan Level Due Diligence in connection with the BOAMS 2008-A securitization, BOA-Securities was negotiating with a third-party originator to **expand** the amount of Loan Level Due Diligence BOA-Securities would conduct in connection with its role as underwriter for an RMBS being structured for that originator.  In fact, the employee at BOA-Securities who served as the deal manager for the BOAMS 2008-A securitization (and who was in the reporting chain of the BOA-Securities Managing Director) received an email on December 5, 2007 from the head of BOA-Securities' Due Diligence Group explaining why she believed that certain Loan Level Due Diligence, including a "fraud check," needed to be done on "100% of the pool" collateralizing the third party's RMBS.  Part of the rationale provided for wanting an expanded Loan Level Due Diligence sample was the deteriorating "current market environment."

122.     Thus, while the market was demanding **more** Loan Level Due Diligence on RMBS deals, BOA-Securities and BOA-Bank decided to conduct **less** Loan Level Due Diligence

58

on the BOAMS 2008-A securitization. Compounding the problem, BOA-Securities and BOA-Bank made this decision knowing that the collateral pool for the BOAMS 2008-A securitization contained a significantly higher proportion of Wholesale mortgages than past BOAMS securitizations and that such mortgages were experiencing a marked decline in performance and conformance with BOA-Bank's underwriting standards. BOA-Securities and BOA-Bank also knew at the time of the decision to forgo Loan Level Due Diligence that a large proportion of the mortgages in the BOAMS 2008-A collateral pool were PaperSaver mortgages given to self-employed borrowers. Moreover, as discussed above in Paragraph 70, BOA-Bank also knew that a number of mortgages in the BOAMS 2008-A collateral pool did not adhere to BOA-Bank's underwriting standards. Tellingly, the head of BOA-Securities' Due Diligence Group admitted that she disagreed with the decision not to conduct any Loan Level Due Diligence for the BOAMS 2008-A securitization, but was overruled by her superiors.

123. Contemporaneous emails between BOA-Securities employees working on the BOAMS 2008-A securitization reveal that Defendants decided not to conduct Loan Level Due Diligence in part to "reduce expenses" and improve the profitability of the deal. Defendants wanted to minimize the expenses on the BOAMS 2008-A securitization because BOA-Bank had already lost money on the mortgages collateralizing the securitization and it believed it was going to lose additional money when the securitization closed.

124. Thus, at least in part to save the approximately $15,000 it would have cost to conduct Loan Level Due Diligence on a sample of the mortgages collateralizing the BOAMS 2008-A securitization, Defendants decided to expose investors to additional undisclosed risk by forgoing Loan Level Due Diligence. Moreover, Defendants had an even greater financial motive

59

in not conducting Loan Level Due Diligence in connection with the BOAMS 2008-A securitization. Had Loan Level Due Diligence found the same types of serious or critical underwriting exceptions in the proposed collateral pool for BOAMS 2008-A as BOA-Bank's QA Department found in the general population of mortgages originated by BOA-Bank discussed above, more than 10% of the mortgages may have been kicked out of the collateral pool and returned to BOA-Bank – exposing it to even greater losses and the risk that the mortgages would default while in BOA-Bank's inventory.

125.    The Offering Documents did not disclose to investors in the Certificates that BOA-Securities failed to adhere to its own policies and procedures (and past practice) and industry standards by failing to conduct any Loan Level Due Diligence on the mortgages in the collateral pool for the BOAMS 2008-A securitization. The omitted information would have been material to reasonable investors because the failure to conduct Loan Level Due Diligence meant that BOA-Bank, BOA-Securities, and BOA-Mortgage made the statements in the Offering Documents about the quality of the mortgages in the collateral pool for the BOAMS 2008-A securitization without any basis for determining their veracity. The failure to conduct any Loan Level Due Diligence also contributed to the fact that, contrary to the representations in the prospectus and prospectus summary set forth in Paragraph 54 above, a significant number of mortgages in the BOAMS 2008-A collateral pool did not meet BOA-Bank's underwriting standards. Had BOA-Securities or BOA-Bank performed reasonable Loan Level Due Diligence, many of these mortgages would have been identified for removal from the BOAMS 2008-A collateral pool.

126.     The failure to conduct Loan Level Due Diligence also contributed to the Offering

Documents and Preliminary Marketing Materials containing material false and misleading

statistics concerning the characteristics of the mortgages in the BOAMS 2008-A collateral pool.

Specifically, the statistics in the Offering Documents and Preliminary Marketing Materials

concerning the DTI ratios, occupancy statuses, credit scores, LTV ratios, and CLTV ratios

associated with the mortgages in the collateral pool were all materially false and misleading

because they did not accurately reflect the data contained in the underlying mortgage files.  Had

BOA-Securities or BOA-Bank performed reasonable Loan Level Due Diligence, many of these

false statements could have been corrected.  Reasonable investors in the Certificates would have

relied upon these statistics to determine whether to invest and, if so, how much to pay for the

Certificates.  Moreover, credit rating agencies relied upon these false statements when assigning

credit ratings to the Certificates.

127.     BOA-Securities sent emails to investors attaching Preliminary Marketing

Materials containing materially false statistical information concerning the mortgages in the

BOAMS 2008-A collateral pool on numerous occasions including:  December 17, 2007 to

FFBIC; December 19, 2007 to FFBIC; January 14, 2007 to FHLB-San Francisco; and January

29, 2008 to FFBIC.

128.     Compounding their omissions, Defendants also directed investors to BOA-Bank's

Static Pool Data to find information about previous BOAMS prime securitizations as a useful

comparison without disclosing that – in contrast to the BOAMS 2008-A securitization – Loan

Level Due Diligence had been conducted on the previous BOAMS prime securitizations and had

identified mortgages to be removed from the collateral pool for failing to substantially conform

to BOA-Bank's underwriting standards and had identified material errors in the statistics in the offering documents and other marketing materials concerning the characteristics of the mortgages in the collateral pool to be corrected.

## IV.    Additional Evidence of Defendants' Motive and Knowledge

129.    As set forth in the above allegations, Defendants knowingly and willfully misled investors about the quality and safety of the mortgages in the collateral pool for the BOAMS 2008-A securitization.  Rather than the pool of high-quality prime mortgages investors were led to believe backed the Certificates, the BOAMS 2008-A collateral pool consisted largely of mortgages originated through BOA-Bank's Wholesale Channel and PaperSaver mortgages given to purportedly self-employed borrowers.  Yet as poor as the BOAMS 2008-A collateral pool was, BOA-Bank tried to make it even worse by including several mortgages BOA-Bank had labeled as "Alt-A", i.e. of significantly lower credit quality than prime mortgages.

130.    On November 30, 2007, a BOA-Bank employee (who ultimately reported up to a managing director at BOA-Securities) sent an email to the BOA-Securities Trader and others at BOA-Bank and BOA-Securities with a list of mortgages that BOA-Bank wanted to include in the collateral pool for the BOAMS 2008-A securitization, which was then scheduled to close in early December.  The BOA-Bank employee wrote, "The attached file includes the **alt a loans** which are paper saver, rapid, and standard doc types that we'd like to include in the deal." (Emphasis added)  BOA-Bank needed to dispose of these mortgages quickly because it had just learned that a proposed sale of those mortgages to a third party had fallen through and the mortgages were getting older (and thus less marketable).  Moreover, until BOA-Bank sold the mortgages, it retained the risk that they could default.  The next day, the BOA-Securities Trader rebuked the

BOA-Bank employees writing:

> I combed through these loans one by one. None of these loans are suitable for a prime jumbo A-Credit securitization. The combination of stated docs, high combined ltv's [Loan to Value ratios], exception underwriting make these loans very much alternative underwriting. Therefore, I am not comfortable adding them to the pool.

131. Two days later, on December 3, 2007, one of the members of the BOA-Securities Trader's team sent an email the BOA-Securities Trader and others expressing frustration over the efforts to add poor quality mortgages to the BOAMS 2008-A collateral pool. Referencing the substandard mortgages, he wrote "like a fat kid in dodgeball, these need to stay on the sidelines."

132. Because the BOA-Securities Trader had responsibility for trading the riskiest subordinated tranches of the Certificates, which were the first Certificates to suffer losses if mortgages in the BOAMS 2008-A collateral pool defaulted, his financial incentives were not completely aligned with those of BOA-Bank, BOA-Mortgage, and of others at BOA-Securities. Losses suffered by the subordinate tranches of the BOAMS 2008-A Certificates would have a direct negative effect on the profitability of his trading book.

133. Shortly after these email exchanges, BOA-Bank and BOA-Securities decided to postpone the BOAMS 2008-A securitization until January 2008. A BOA-Bank manager (who ultimately reported up to a managing director at BOA-Securities) described the rationale for delaying the securitization in a December 6, 2007 email: "The initial impetus to sell was to avoid further losses, so losing a lot of money by selling didn't go over too well."

134. Later in January 2008, BOA-Bank again made efforts to put poor quality mortgages – $24 million worth – in the BOAMS 2008-A collateral pool. Again, this effort was rebuked by the BOA-Securities Trader and his team because of the "inherent rating agency risk" associated with adding such mortgages to the collateral pool.

63

135.    While the BOA-Securities Trader and his team were somewhat successful in keeping BOA-Bank from adding additional poor quality mortgages to the BOAMS 2008-A collateral pool at the last minute, they did not have any such success (or opportunity) with respect to the bulk of the collateral pool, which was already formed prior to December 3, 2007.

136.    Defendants' motives for including poor quality mortgages in the BOAMS 2008-A collateral pool and misleading investors about the quality and risks of the mortgages in the collateral pool went beyond the desire to maximize the proceeds from the sale of the Certificates and to transfer the risk of owning the poor quality mortgages to investors. Upon information and belief, Defendants also worried that if investors were unwilling to pay a high price for the Certificates, it would have significant repercussions on the value BOA-Bank and BOA-Securities placed on other pools of mortgages and RMBS certificates they owned due to the requirements of mark to market accounting. Indeed, in December 2007, there was conflict between BOA-Securities' employees, including the BOA-Securities Trader, and others within BOA-Corp. about the values that BOA-Securities, BOA-Bank, and BOA-Corp. should assign to the pools of mortgages and RMBS certificates they owned. Indeed, BOA-Corp's Finance Department encouraged those with responsibility for valuing Defendants' inventory of RMBS certificates and mortgage pools to explore the possibility of abandoning the use of current market prices to value those assets under the theory that current market prices were "distressed."

## V.    Defendants' Conduct Affected Federally Insured Financial Institutions

137.    Defendants' wrongful conduct alleged in this Complaint has caused actual losses to Wachovia and FHLB-San Francisco and exposed them to additional risk of future losses. It also has caused losses to the other investors in the Certificates and exposed them to additional

64

risk of future losses as well. Further, Defendants' wrongful conduct has exposed BOA-Bank and BOA-Mortgage to additional risk of loss through penalties they may be ordered to pay in connection with this Complaint, related damages and penalties they may have to pay in private civil litigation and actions brought by other federal and state law enforcement and regulatory agencies, and reputational damage.

138.    As of June 2013, at least 181 (15.4%) of the borrowers whose mortgages comprised the collateral pool for the BOAMS 2008-A securitization had defaulted – causing more than $69 million in principal losses. Moreover, a significant number of additional mortgages (at least 90 or 7.6%) were delinquent, in bankruptcy, and/or going through foreclosure and almost certainly going to cause additional principal losses. Fitch Ratings has projected that the Certificates will suffer at least an additional $50 million in principal losses during their lifetime. As a result, the Certificates have performed significantly worse than expected. Indeed, Moody's originally projected collateral losses of only 0.40% ($3.42 million) to 0.50% ($4.35 million) for the **entire** BOAMS 2008-A collateral pool. Further, the Certificates have suffered credit downgrades, and they are at risk of suffering additional losses and credit downgrades. Moreover, certain subordinated tranches of the Certificates have already been completely written off. FHLB-San Francisco, Wachovia, and the other investors have already lost millions of dollars in principal reductions,

lost interest, and a lower market value for the Certificates, and they are likely to suffer additional loses in the future as a result of their investment in the Certificates.

139.    FHLB-San Francisco and Wachovia purchased only the highest-rated Certificates from the BOAMS 2008-A Securitization, all but one of which were rated triple-A at the time of

65

issuance. Eight of the nine classes of Certificates purchased by FHLB-San Francisco and Wachovia were downgraded below investment grade within roughly 18 months of being sold, and as of August 2012, all nine classes carried a rating below investment grade. The downgrades were acknowledgements that the BOAMS 2008-A collateral pool was not of the quality described in the Offering Documents. The table below reflects the history of ratings provided by Moody's for the Certificates purchased by FHLB-San Francisco and Wachovia.[5]

**Table 6 – Credit Ratings of Certificates Purchased by FHLB-San Francisco and Wachovia**

| CUSIP | Original (1/28/08) Rating Moody's | 7/17/09 Rating Moody's | 4/30/10 Rating Moody's | 8/31/12 Rating Moody's |
|---|---|---|---|---|
| 05955BAB5 | Aaa | Ca | C | Withdrawn (8/15/2012) |
| 05955BAE9 | Aaa | Ba | Caa | Caa |
| 05955BAF6 | Aaa | Caa | Ca | Ca |
| 05955BAK5 | Aaa | Ca | C | C |
| 05955BAN9 | Aaa | Ba | B | Caa |
| 05955BAP4 | Aaa | Caa | Ca | Ca |
| 05955BAV1 | Aaa | Baa | Baa | Ba |
| 05955BAW9 | Aaa | Caa | Caa | Ca |
| 05955BAY5 | Aa | C | C | Withdrawn (8/30/2012) |

140. The poor performance of the Certificates was much worse than expected for a securitization of purportedly prime mortgages, especially one in which the average borrower purportedly had a FICO score of 750. This poor performance cannot be blamed solely on the downturn in the residential real estate market and credit crunch experienced over the last few years. For example, as of April 2013, the BOAMS 2008-A securitization had suffered more principal losses than the previous two BOAMS securitizations combined, which closed in August and November 2007. Similarly, the 8.5% cumulative net loss rate for the BOAMS 2008-A securitization is the greatest relative net loss rate of any comparable BOAMS securitization.

---

[5] Per Moody's website, securities rated "Ba" or lower (including those rated "B", "Caa", or "Ca") are considered "speculative" and not investment grade. *Id.* Securities rated "C" are "the lowest rated and are typically in default, with little prospect for recovery." *Id.*

66

## CAUSES OF ACTION

### Count One
### FIRREA Civil Penalties for False Statements Within Jurisdiction of United States
### (18 U.S.C. § 1001)

141.    Plaintiff realleges and incorporates paragraphs 1 through 140 as though fully set forth herein.

142.    Defendants knowingly and willfully made and/or caused to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States.

143.    Specifically, Defendants knowingly and willfully filed and/or caused to be filed with the United States Securities and Exchange Commission: (i) the prospectus and prospectus supplement for the BOAMS 2008-A securitization, which were dated January 25, 2008, and filed or about January 29, 2008; (ii) two free writing prospectuses, which were filed on January 23, 2008 and January 28, 2008; and (iii) the PSA, which was dated January 28, 2008, and filed on or about February 2, 2008.  In addition, BOA-Securities provided, and/or caused to be provided, and/or made available, and/or caused to be made available, these materials as well as the Preliminary Marketing Materials to FHLB-San Francisco.

144.    The prospectus and prospectus supplement were materially false, fictitious, and/or fraudulent because they contained, among others, the following materially false statements:

a.    "Each Mortgage loan" in the trust "will have been underwritten … to the standards set forth in this prospectus…."

b.    "Each mortgage …is underwritten in accordance with guidelines established in Bank of America's Product and Policy Guides."

67

       c.    "Under Bank of America's "PaperSaver(R)" documentation program, verification of the applicant's stated income and stated assets is not requested (with the exception of self-employed applicants who are required to sign the IRS form 4506-T (Request for Transcript of Tax Returns))."

    145.    The prospectus and prospectus supplement also were materially false, fictitious,

and/or fraudulent because they concealed the following material facts:

       a.    That BOA-Bank originated over 70% of the mortgages in the BOAMS 2008-A collateral pool through the Wholesale Channel.

       b.    That Prime Jumbo mortgages originated by BOA-Bank in 2007 experienced significantly more serious delinquencies (and experienced them in far less time) than similar mortgages it originated in 2003, 2004, 2005, or 2006.

       c.    That BOAMS securitizations backed by prime jumbo mortgages issued in 2007 were nearly six times more likely to be collateralized by seriously delinquent mortgages than similar securitizations issued in 2007 by Citibank, Countrywide, and Wells Fargo.

       d.    That of BOA-Bank mortgages originated in 2007 that went delinquent within a few months after origination, the proportion of mortgages not even making their first payment increased from 22% in July 2007 to 75% in November 2007.

       e.    That mortgages originated through the Wholesale Channel accounted for between 39% and 58% of all the non-government insured or guaranteed mortgages originated by BOA-Bank that experienced a delinquency within the first few months of origination during the fall of 2007.

       f.    That mortgages originated through the Wholesale Channel in the second and third quarters of 2007 experienced a significant increase in the amount of Ever 90 delinquencies, and that those Wholesale mortgages experienced disproportionately more Ever 90 delinquencies than mortgages BOA-Bank originated directly during that period.

       g.    That Wholesale mortgages caused more losses to investors in BOA-Bank sponsored RMBS in 2007 than mortgages BOA-Bank originated through other channels.

       h.    That of the mortgages that served as collateral for BOA-Bank sponsored RMBS sold in 2007 that failed to make their first payment or one of their first few payments, 77% had been originated through BOA-Bank's Wholesale Channel.

i. That of the mortgages that served as collateral for BOA-Bank sponsored RMBS sold in 2007 that were seriously delinquent, 80% had been originated through BOA-Bank's Wholesale Channel.

j. That BOA-Bank's loan performance data showed that the performance of mortgages it originated was steadily deteriorating throughout 2007, particularly Wholesale mortgages.

k. That 22% of the mortgages in the BOAMS 2008-A collateral pool were provided to purportedly self-employed borrowers and that over 15% of the BOAMS 2008-A collateral pool consisted of mortgages given to purportedly self-employed borrowers with a PaperSaver mortgage.

l. That mortgages provided to self-employed borrowers presented more risk to investors than did mortgages provided to salaried employees with similar credit scores.

m. That reduced documentation mortgages, such as PaperSaver, presented more risk to investors than standard documentation mortgages.

n. That PaperSaver mortgages BOA-Bank provided to self-employed borrowers presented more risk to investors than non-PaperSaver mortgages it provided to self-employed borrowers.

o. That BOA-Securities conducted Loan Level Due Diligence on past BOAMS securitizations, and when doing so, it routinely identified mortgages to be removed from the collateral pools for failing to substantially conform to BOA-Bank's underwriting standards and it routinely identified material errors in the statistics concerning the characteristics of the mortgage loans in the collateral pools.

p. That despite its own policies and procedures, industry standards, investor expectations, and the requirements of the federal securities laws and despite the objection of the head of BOA-Securities Due Diligence Group, BOA-Securities did not conduct any Loan Level Due Diligence on the mortgages in the BOAMS 2008-A collateral pool, at least in part, to save approximately $15,000, and at the time BOA-Securities made this decision, it was demanding more Loan Level Due Diligence in connection with underwriting a third party's RMBS.

q. That the Static Pool information concerning BOA-Bank's prior RMBS securitizations involving mortgages originated by BOA-Bank was not a relevant comparison for investors in the BOAMS 2008-A securitization because the BOAMS 2008-A collateral pool contained materially larger proportions of Wholesale mortgages and of PaperSaver mortgages provided to self-employed borrowers than did previous BOAMS securitizations and

69

because no Loan Level Due Diligence was conducted in connection with the BOAMS 2008-A securitization.

146.    The free writing prospectuses and Preliminary Marketing Materials were materially false, fictitious, and/or fraudulent because they contained false and misleading statistics concerning, among others, the DTI ratios, occupancy statuses, credit scores, and loan-to-value ratios associated with the mortgages in the collateral pool that did not accurately reflect the data contained in the underlying mortgage files.

147.    The PSA was materially false, fictitious, and/or fraudulent because it contained, among others, the following materially false statements:

    a.   "Any and all requirement of any federal, state or local law … applicable to the origination and servicing of [each] Mortgage Loan have been complied with."

    b.   "There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration."

    c.   "Each appraisal of the related Mortgaged Property is in a form acceptable to Fannie Mae or Freddie Mac and such appraisal complies with the requirements of FIRREA, and was made and signed, prior to the approval of the Mortgage Loan application, by a Qualified Appraiser."

    d.   "The Mortgage Loan was underwritten in accordance with the applicable Underwriting Guidelines in effect at the time of origination with exceptions thereto exercised in a reasonable manner."

148.    Based upon these violations, Defendants and each of them are liable for civil money penalties pursuant to 12 U.S.C. § 1833a.

## Count Two
## FIRREA Civil Penalties for False Statements to Financial Institutions (18 U.S.C. § 1014)

149. Plaintiff realleges and incorporates paragraphs 1 through 148 as though fully set forth herein.

150. Defendants knowingly made a false statement or report and/or willfully overvalued a security for the purpose of influencing the action of investors in the Certificates, including FHLB-San Francisco and Wachovia, in connection with the purchase of the Certificates.

151. Defendants made false statements and/or reports in the: (i) the prospectus and prospectus supplement for the BOAMS 2008-A securitization, which were dated January 25, 2008, and filed or about January 29, 2008; (ii) two free writing prospectuses, which were filed on January 23, 2008 and January 28, 2008; (iii) the PSA, which was dated January 28, 2008, and filed on or about February 2, 2008; and in Preliminary Marketing Materials, including those provided to FFBIC on December 17, 2007, December 19, 2007, and January 29, 2008 and to FHLB-San Francisco on January 29, 2008. Defendants made these false statements and/or reports described herein for the purpose of influencing investors in the Certificates, including FHLB-San Francisco and Wachovia, in connection with the purchase of the Certificates. The prospectus, prospectus supplement, PSA, free writing prospectuses and Preliminary Marketing Materials contained materially false and misleading statements and omitted other material information as set forth in Paragraphs 144, 145, 146, and 147 above.

152. Defendants also overvalued securities for the purpose of influencing the action of investors in the Certificates, including FHLB-San Francisco and Wachovia, in connection with the purchase of the Certificates. Specifically, Defendants overvalued the BOAMS 2008-A

Certificates sold to investors by making the misstatements set forth in Paragraphs 144, 146, and 146 above and by failing to disclose the information set forth in Paragraph 145 above.

153.     FHLB-San Francisco and/or its Members and Wachovia were federally insured financial institutions at all times relevant to Defendants' false statements or reports and/or overvaluation of a security.

154.     Defendants' false statements and reports and/or overvaluation of a security caused investors in the Certificates, including FHLB-San Francisco and Wachovia, losses and/or exposed them to a risk of loss.

155.     Based upon these violations, Defendants and each of them are liable for civil money penalties pursuant to 12 U.S.C. § 1833a.

## REQUEST FOR RELIEF

**WHEREFORE,** the United States respectfully requests that judgment be entered in its favor and against Bank of America Corporation, Bank of America, N.A., Banc of America Mortgage Securities, Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc. f/k/a Banc of America Securities LLC as follows:

      a.    Award the United States a civil money judgment against each of the Defendants in the maximum amount authorized under 12 U.S.C. § 1833a;

      b.    Award the United States prejudgment interest;

      c.    Award the United States all costs and attorneys' fees incurred in this action as permitted by law;

      d.    Grant the United States such other and further legal relief as may be just and proper.

This 6th day of August, 2013.

                     Respectfully submitted,

                     ANNE M. TOMPKINS
                     UNITED STATES ATTORNEY

                     **s/ Daniel S. Ryan**             
                     DANIEL S. RYAN
                     MARK T. ODULIO
                     Assistant United States Attorneys
                     227 West Trade Street, Suite 1650
                     Charlotte, NC  28202
                     Tel. 704.344.6222
                     Fax 704.344.6629
                     email:  daniel.ryan@usdoj.gov
                                 mark.odulio@usdoj.gov

73